Petition of the **UNITED STATES** of America and Marine Transport Lines, Inc., as owners of the **USNS POTO-MAC**, for exoneration from or limitation of liability.

Mary Esther Ford **LEONARD**, Administratrix of the Estate of Clyde Virgesto Leonard, deceased, Libelant,

v.

**UNITED STATES** of America, Marine Transport Lines, Inc., and Aviation Fuel Terminals, Inc., Respondents.

Eugene **ALVES** et al., Libelants,

v.

**UNITED STATES** of America, and Marine Transport Lines, Inc., Respondents,

and

Aviation Fuel Terminals, Inc., Respondent-Impleaded.

Nos. 278, 272 and 273.

United States District Court
E. D. North Carolina,
New Bern Division.

July 14, 1969.

As Amended Aug. 14, 1969.

See also D.C., 237 F.Supp. 434.

William E. Gwatkin, III, Admiralty and Shipping Section, Dept. of Justice, Washington, D. C., and Robert H. Cowen, U. S. Atty., Raleigh, N. C., for the United States and Marine Transport Lines, Inc.

Vandeventer, Black, Meredith & Martin, Hugh S. Meredith, Norfolk, Va., Rountree & Clark, Wilmington, N. C., Claud R. Wheatly, Jr., Beaufort, N. C., for Aviation Fuel Terminals, Inc.

Kelsey & Owens, Sidney H. Kelsey, Norfolk, Va., for Mary Esther Ford Leonard, Admx., etc.

George H. McNeill, Morehead City, N. C., for William F. Craig and Therence G. Cloud.

Joseph H. Levinson, Smithfield, N. C., for William H. Massengill, Wade H. Stanley, and William Gerald Massengill.

Schwartz & O'Connell, Donald E. Klein, New York City, and William K. Rhodes, Jr., Wilmington, N. C., for estate of

Peter Salopek and estate of John C. Smith.

Breit, Rutter, Cohen, Ermlich & Friedman, C. Arthur Rutter, Jr., Norfolk, Va., and Lee Pressman, New York City, for Eugene Alves, and others, including all crew members other than Leonard, Salopek, Smith, Craig and Cloud.

Lake, Boyce & Lake, Raleigh, N. C., for A. T. Leary, lessee of Beaufort & Morehead R. R. Co., and Home Insurance Co., as subrogee of A. T. Leary, etc.

Block, Meyland & Lloyd, Greensboro, N. C., for Coastal Realty Co.

## MEMORANDUM

WALTER E. HOFFMAN, District Judge (under designation).

On September 26, 1961, the United States Naval Ship POTOMAC, a Navy tanker and a public vessel of the United States, was moored in the harbor of Morehead City, North Carolina, alongside a fuel pier belonging to Aviation Fuel Terminals, Inc., which had contracted with the United States for the handling and storage of Government-owned petroleum products. While the POTOMAC was discharging a Government-owned cargo of aviation gasoline and jet fuel, a fire broke out on the surface of the water near or underneath a railroad trestle crossing the Newport River, nearly half a mile away.

The fire spread toward Aviation Fuel's pier, and after it reached the pier and burned alongside the POTOMAC for awhile, there were a series of severe explosions on board, setting her afire and ultimately causing her to sink at the pier in 30 feet of water. The fire and explosions destroyed Aviation Fuel's pier, caused the total loss of the POTOMAC and her cargo, and allegedly have resulted in the death and injuries of various members of her crew, as well as certain other damage to persons and property in the vicinity.

These proceedings commenced with a petition for exoneration from or limitation of liability,[1] brought pursuant to the Shipowners' Limitation of Liability Act, 46 U.S.C., sections 183–189, by the United States as owner of the USNS POTOMAC and by Marine Transport Lines, Inc., as the POTOMAC's operating agent, with standing as such to petition under 46 U.S.C., section 186.[2]

[1.] Two earlier suits were brought on seaman's death and injury claims against the United States and Marine Transport Lines in the Eastern District of Virginia, which were thereafter transferred to this Court and consolidated for trial with this proceeding. Mary Esther Ford Leonard, Admx. v. United States and Marine Transport Lines, Inc. v. Aviation Fuel Terminals, Inc. (EDNC Adm. No. 272). Eugene Alves, et al v. United States and Marine Transport Lines, Inc. v. Aviation Fuel Terminals, Inc. (EDNC, Adm. No. 273).

Two related actions, not consolidated with the present cases, are likewise pending in this Court, Sarah Smith, Administratrix of the Estate of John C. Smith v. Aviation Fuel Terminals, Inc. (EDNC, Civil No. 566), and Agnes Salopek, Administratrix of the Estate of Peter Salopek v. Aviation Fuel Terminals, Inc. (EDNC, Civil No. 567), and as the present decision may affect these cases, copies of the memorandum will be filed therein.

[2.] It has been decided on interlocutory appeal earlier in these proceedings that there can be no recovery against Marine Transport Lines because of the exclusivity provisions of the Public Vessels and Suits in Admiralty Acts, 46 U.S.C., sections 741–752, 781–790. Smith v. United States, 346 F.2d 449 (4th Cir., 1965), cert. denied 382 U.S. 878, 86 S.Ct. 163, 15 L.Ed.2d 119 (1965); see also Petition of United States, 367 F.2d 505, 509–511 (Third Cir., 1966) cert. denied Black v. United States, 386 U.S. 932, 87 S.Ct. 953, 17 L.Ed.2d 805, rehearing denied, 386 U.S. 1000, 87 S.Ct. 1303, 18 L.Ed.2d 354. In *Smith*, the Fourth Circuit held (346 F.2d at 454):

"Our conclusion is that Marine [Transport Lines] should now be declared exonerated, by reason of the statute, of any liability to the appellant-claimants."

As the law of this case, the *Smith* decision requires that the petition of Marine Transport Lines for exoneration herein must be granted. The *Smith* case was heard on its merits in the present controversy following the denial of certiorari by the Supreme Court.

In response to the petition, 38 claims aggregating $2,111,413.17, including a claim by Aviation Fuel, were filed against the United States, which in turn filed an impleading petition for recovery over against Aviation Fuel, and thereby tendered Aviation Fuel to the claimants as an additional defendant. The United States also filed a crossclaim against Aviation Fuel for the loss of the PO-TOMAC and her cargo.

The proceedings went to trial on the merits, and on damages with respect to the death and personal injury claims.[3] The case is before the Court for determination as to: (1) whether the United States is entitled to exoneration as to all claims; (2) if not, which claimants, including Aviation Fuel, are entitled to recovery against the United States; (3) whether and which claimants are entitled to recovery against Aviation Fuel; (4) as to those death and personal injury claimants entitled to recovery, the amount thereof; (5) whether the United States is entitled to limitation of liability, both as to property damage as well as death and personal injury claims;[4] (6) whether the United States is entitled to recovery over against Aviation Fuel by way of reimbursement, contribution, indemnity or otherwise; and (7) whether the United States is entitled to recovery in whole or in part against Avia-tion Fuel for the loss of the POTOMAC and her cargo.

### THE USNS POTOMAC

The United States Naval Ship POTOMAC was a Navy tanker and a public vessel of the United States, used exclusively for the carriage of Government-owned petroleum products for the military services. At all times material to this action, she was operated on behalf of the United States by Marine Transport Lines, as the Navy's public vessel operating agent.

She was a rather new tanker, of a new T-5 class.[5] Built in 1957 in accordance with the Rules of the American Bureau of Shipping for Building and Classing Steel Vessels, she had a length of 593 feet, a breadth of 83.9 feet, and a depth of 42.6 feet. She measured 15,626 gross tons, 9,380 net tons, and had a cargo carrying capacity of 203,215 barrels.

The POTOMAC had nine main cargo tanks, running across the ship, each of which was divided by fore and aft bulkheads into three sections. The sections on the port and starboard sides were known as wing tanks, and those on the center line between them were known as the center tanks. In addition, there were two sets of deep tanks forward of the No. 1 cargo tank, the after one of which, known as the No. 2 deep tank, was also

---

3. Trial of damages on claims for property damage was reserved until after entry of an interlocutory decree on the merits.

4. The petition was supported by affidavits showing that the value of the POTOMAC as she lay after the disaster was $577,000, and that her estimated costs of salvage were $800,000, so that her value for limitation purposes is zero. The POTOMAC measured 15,626 gross tons, and at $60 per gross ton there would be a limitation fund of $937,560 available for death and personal injury claimants in some cases under 46 U.S.C., section 183(b). The United States contends that under 46 U.S.C., section 183 (f), the $60 per gross ton exception to the limitation statute is inapplicable to tank vessels, but the case law on the subject is apparently contrary to this con-

tention. In re Petition of The Dodge, Inc., 282 F.2d 86, 89–90 (2 Cir., 1960); Petition of Panama Transport Co., 73 F. Supp. 716 (S.D.N.Y., 1947); Oliver J. Olson & Co. v. American Steamship MARINE LEOPARD, 356 F.2d 728, 737, ftnote 4 (9 Cir., 1966); 3 Benedict, Admiralty, sec. 475, p. 321, sec. 494, p. 405 (6th Ed., 1940). Contra: Gilmore & Black, Admiralty, sec. 10–35, p. 720. There is much to be said in argument, it being urged that the legislative history demonstrates that the language of section 183(f) refers only to tankers of the river and harbor type, but in view of the conclusions herein reached the point is immaterial.

5. At the time of the Morehead City disaster, there were only four T-5 tankers in existence.

used for carrying liquid cargo. It was divided into two sections, known as the port and starboard deep tanks.

Immediately aft of the No. 9 cargo tank was the main pump room, where the ship's four main cargo pumps were located. Aft of the pump room were the machinery spaces, the boiler room, and the engine room in the stern of the ship. The crew's living quarters were in the after superstructure, aft of the cargo tanks and above the machinery spaces, one or more decks above the main deck. The officers were housed in the amidships superstructure, located above the No. 3 and No. 4 tanks, which also contained the ship's radio room, the bridge and the pilot house. A catwalk above the main deck led aft along the center line from the amidships superstructure to the after house and led forward to the forecastle deck, which commenced immediately forward of the No. 2 deep tank, one deck above the main deck.

The POTOMAC was designed so that her cargo tanks could be divided into four isolated systems for carrying four separate types of cargo. Each of these systems utilized its own set of lines and valves, and its own cargo pump, which pumped cargo up into a manifold line running across the main deck just aft of the amidships superstructure above the No. 5 tank, with four hose connections on both the port and starboard sides.

The four systems ran in the following manner. The No. 1 and No. 2 tanks, and the deep tanks, were connected through the starboard outboard suction line to the starboard outboard cargo pump. The No. 3 and No. 4 tanks were connected through the starboard inboard suction line to the starboard inboard cargo pump. The No. 5 and No. 6 tanks were connected through the port inboard suction line to the port inboard cargo pump. And finally, the No. 7, No. 8, and No. 9 cargo tanks were connected to the port outboard suction line through the port outboard cargo pump. Each of the four cargo pumps had a 4,200 gallon per minute capacity, and a relief valve set at 125 pounds per square inch.

In the main pump room, there were certain crossover lines which permitted transfer of cargo between the four systems. The upper crossover was on the discharge side of the pumps, and connected the discharge lines leading from the cargo pumps up to the main deck. The lower crossover was on the suction side of the pumps, and connected the suction lines leading to the pumps from the cargo tanks. There was a third crossover at the bottom of the pump room, known as the sea suction crossover line, or simply the sea line, which was isolated from the cargo piping systems and used for taking on or discharging sea water ballast, connecting through drop valves with the suction lines from the cargo tanks, and thus with the cargo pumps.

At either end of the sea line were the sea suction valves, one on the port and one on the starboard side, through which sea water ballast is taken on or discharged. There was a third sea suction valve in the pump room known as the "eductor valve" or "master eductor valve" located on the starboard side of the pump room, and the sea chest or sea spool with which it was connected to the upper and lower crossover lines was also on the starboard side of the bottom of the vessel. This valve was closed and is not involved in this proceeding.

It is of prime importance that the sea suction valves are closed during cargo handling operations, so as to avoid contamination of petroleum cargo with sea water, and to avoid losing cargo overboard. For this reason, the POTOMAC's operating manual stated that the first step in discharging cargo was to "secure master sea suction valves" and to "close the pump discharge valve connected to the sea crossover line." The Navy required a certification that the sea suctions were closed and sealed, emphasizing on the form that "sea suctions and overboard discharges should be carefully checked before commencement of loading to make sure that they are closed, and then sealed." And Marine Transport Lines as operating agent had issued an oil pollution manual which contained

strict instructions that in preparing to discharge cargo:

"Sea valves and stern loading connections should be inspected to insure that they are tightly closed and that seals, if used, from the loading port remain intact."

The piping arrangement in the pump room demonstrates that the closing of these discharge valves, which were connected with the sea crossover line, would completely isolate the sea crossover line from the piping system during a cargo discharge operation. Section 36, paragraph 26(b) of the American Bureau of Shipping requirements provides:

"Where sea suctions are provided for ballasting purposes, two valves are to be fitted between the sea chest and the cargo piping, one of which is to be capable of being locked in the closed position."

There is very little dispute as to the fact that an attempt to discharge cargo through the sea line is generally frowned upon and is considered an unsafe practice. Yet cargo was being discharged through the sea line just prior to the outbreak of the fire.

## THE LOADING AT HOUSTON, TEXAS

The POTOMAC's voyage which terminated with the disaster at Morehead City had commenced at Houston, Texas, in mid-September of 1961. She had arrived in the Houston area in ballast on September 15, 1961, having first discharged some ballast at sea, and discharging the balance into ballast pits at various loading facilities in Houston.

When in port, the sea suction valves are not used in the discharge of ballast as ballast is pumped up into the deck lines and discharged into a pit ashore. However, while at sea the sea suction valves are used to discharge ballast. The quantity of ballast required to be dis-

charged at sea controls whether one or both of the sea suction valves will be opened. If there are only one or two tanks to be deballasted, generally only one sea suction valve is opened; if there are more tanks to be deballasted, the usual procedure is to open both sea suction valves. On the voyage from Greenland to Houston in ballast, the record does not affirmatively demonstrate whether one or two valves were opened. It is true that the recommended practice is to use only the starboard sea suction but, in this case, the chief pumpman who opened whatever sea suction valves were opened did not testify.[6] Bert Forman, the chief mate at the time of any deballasting, testified that the matter of opening either or both of the sea suction valves was left to the chief pumpman and that, in pumping out the usual amount of ballast, both sea suction valves would normally be used in order to more expeditiously accomplish the job.

It is conceded that most of the POTOMAC's sea water ballast was pumped out prior to the arrival of the vessel in Galveston Bay. There is affirmative evidence that the chief mate gave an order to the chief pumpman "To close off the sea suction and stand by and wait and see what happens." Neither the chief mate nor any other officer checked the chief pumpman to determine whether the order was fulfilled. Deballasting was discontinued when the vessel arrived at Galveston Roads, and it was approximately 36 hours later before the POTOMAC headed for the Sinclair docks at the Houston Ship Channel. Upon arrival at the Sinclair docks the major portion of the remaining water was pumped ashore.

When ballast is discharged using both the port and starboard sea suction valves it is necessary to use the sea crossover line. Unlike a T–2 tanker, the POTOMAC did not have a block valve inboard of the sea suction valves, which block

6. One of the grounds assigned by the petitioners in an effort to secure a continuance of the trial was the contended inability to secure the presence of the chief pumpman. However, during the prolonged trial and thereafter, apparently all other witnesses mentioned in the motion for continuance were located.

valve operates as a safety factor in the event the sea suction valve becomes faulty, encumbered with debris, or through oversight or neglect is not closed.

As a result of the fire and explosions the vessel sank and, on a later date, was towed to another location in the Morehead City harbor where she rested undisturbed for more than a year. Apparently no one entered the pump room from the time of the fire until the POTOMAC was raised and put in dry dock, other than a diver employed by Merritt-Chapman & Scott who stated that he had instructions not to, and did not, touch any valve in the pump room. After the ship was in dry dock it was discovered that the *port* sea suction valve was open. The pertinent inquiry is whether this port sea suction valve was *sealed* in an open position. Concededly the open port sea suction valve could account for the spillage of the cargo. Petitioner argues that, assuming arguendo the open port sea suction valve at the time of the fire, all evidence points to the opening of this valve by Matamala, the pumpman on watch at the time of the fire, and, therefore, the petitioner would be entitled to limit its liability. The claimants, especially Aviation Fuel, contend that this valve was sealed in an open position, thereby rendering the POTOMAC unseaworthy prior to the commencement of the voyage, thus barring any right to limit liability. For reasons hereinafter stated, we agree with the claimants.

Reverting to the activities of the POTOMAC in the Houston area, we find that she first proceeded from Galveston Bay to the Sinclair Refining Company, arriving at its dock at 7:12 p. m., on September 17, 1961, where she took on a Government-owned cargo of JP–4 jet fuel in her No. 7, No. 8 and No. 9 tanks. She departed from the Sinclair docks at 5:45 p. m. on September 18, 1961, and proceeded to the facilities of the Crown Central Petroleum Company, arriving there at 8:54 p. m. on the same day, where she took on a Government-owned cargo of JP–5 jet fuel in her No. 3 and No. 4 tanks. Departing Crown Central at 2:25 p. m. on September 19, 1961, she next proceeded to the Shell Oil Company dock, arriving there at 4:04 p. m. on the same date, where she took on her remaining cargo of aviation gasoline in her No. 1, No. 2, No. 5, No. 6 tanks and the No. 2 deep tanks. She finished loading at 1:15 a. m. on September 21, 1961, and was ready for sea at 4:00 a. m. on that same date.

While the POTOMAC was in Houston, she was attended by port engineer and marine surveyor Walter Ritter, who was sent down from New York by James C. Clarke, the vice-president and marine superintendent of Marine Transport Lines, the Government's operating agent, to determine whether the ship had any problems and to prepare a repair list for her next shipyard period, which was to be scheduled in the following two or three weeks. The port engineer was under instructions to contact Marine Transport's marine superintendent's office immediately if he discovered any condition that affected the ship's seaworthiness, but Marine Transport received no report of any deficiencies affecting her fitness for her prospective voyage, since Ritter, after having gone over the vessel and made up a list of routine repairs, found nothing that would affect the seaworthiness of the ship.[7]

During the POTOMAC's stay in Houston, several personnel changes were made.[8] The POTOMAC's former master

---

7. After returning to New York, Ritter prepared from his notes formal specifications for the next repair contract, the typed specifications being dated September 25, 1961.

8. The POTOMAC was manned by a crew of civilian merchant seamen, who were hired by Marine Transport Lines as the Government's public vessel operating agent, and whose employment could be terminated by the United States at any time. The officers were required to become members of the United States Naval Reserve; the master was directed and

had died at sea on her last voyage, and all her officers had moved up one grade. Her former chief mate, Arthur Hunter, an experienced tanker officer who had been going to sea for 25 years, with a master's license since 1947, and who had previously sailed on a sister ship of the POTOMAC, remained on the ship as master after receiving detailed instructions as to his duties and responsibilities. Second mate Forman did not wish to continue as chief mate, in which capacity he had been acting, and it was necessary to obtain another chief mate. Marine Transport had none of their own personnel available, and their personnel department selected William P. Maholland, the most qualified officer whose application they had on file, after having first received a very favorable report from Sinclair, his former employer, and from his union. Maholland had been going to sea for about 23 years, had been a licensed officer since 1948, had been sailing on tankers since 1950, had held a master's license since 1959, and had been on Sinclair tankers as master or chief since that time. Maholland had never served aboard a T–5 tanker and he admitted that the piping arrangement on the POTOMAC was quite different from that to which he had become accustomed. When he reported aboard the POTOMAC to relieve Forman, the then chief mate, he made no effort to examine the pump room; nor did he request, nor was ever shown, any diagram of the piping arrangement in the pump room. He did not ever see the chief pumpman who left the vessel at Houston, and concedes that he never studied the operating manual or, in fact, knew that there was such a manual aboard ship. On one occasion Captain Hunter went into the pump room with Maholland for the purpose of explaining to Maholland the water eductor system which had nothing to do with the sea suction valves.

There was also a change of pumpmen, who were obtained through the local union hiring hall. The new first pumpman was Howard Mixon, a duly certificated pumpman, who had been a seaman for 19 years and a pumpman since 1949, and whose last ship had been a tanker with nine cargo systems, as contrasted with the four cargo systems on the POTOMAC.

Mixon, while familiar with T–2 tankers, had never served aboard a T–5 tanker. When Mixon went aboard he met the former chief pumpman who advised that he would complete the job of pumping the ballast. Mixon left the vessel to return to his home without entering the pump room at that time, and he never thereafter saw the former chief pumpman. In fact, during the *continuous* loading operations at the various terminals in the Houston area, Mixon went home for supper each night and left after breakfast each morning.

The new second pumpman was Avelino Matamala, who was also a certificated pumpman, and had been going to sea as such since 1936 or 1937. He joined the vessel on September 20, 1961, just prior to her departure from Houston. Like the others, he had never previously served aboard a T–5 tanker. He asked Mixon for a pumping diagram but was told that the chief mate had said that none was available.

Because the POTOMAC was carrying a military cargo of Government-owned petroleum product, she was regularly attended by a quality control representative, sometimes known as a petroleum inspector, from the Military Petroleum Supply Agency of the Department of Defense, one of whose functions included the sealing of sea suction and other valves essential to cargo isolation, to avoid the possibility of contamination or loss of cargo during shipment. One of the Defense representatives at Houston was Marvin D. Brasfield, who attended the POTOMAC at both the Sinclair and the Shell docks. While he was at Sinclair, he testified that the sea suction

authorized to carry out direct Navy orders concerning the ship, which was at

all times under the Navy's operational control.

valves were checked in his presence, when he had one of the mates open each valve and close it down again, but he did not seal the sea suctions at this time because other types of cargo were to be loaded at other docks.

When he attended the ship at the Shell facilities, where her final cargo was to be loaded, Brasfield said that he went into the pump room with one of the mates, had the valves checked in his presence to determine that they were closed, and then chained and sealed both the port and starboard sea suction valves and the overboard eductor. He recorded the seal numbers on the final cargo loading documents, and also executed an MSTS valve sealing certificate that the sea suctions had been sealed.[9] While Brasfield's recollection was to the effect that he was "pretty sure it was the chief mate [Maholland]" who tightened the valves before the seals were affixed thereto, Maholland testified that he did not recall being present when the valves were sealed, although he noted that they were sealed when he went into the pump room the next morning. Maholland affirmatively stated that he did not know how or by whom the chains and seals were put on the valves. Assuming arguendo that a loading mate (or night mate) was the individual with Brasfield at the time, the record is devoid as to the identity of such person who may have accompanied Brasfield at the time in question. In fact, Brasfield was not contacted as to the events at Houston until approximately 17 months after the fire, and his testimony appears to be predicated largely on the entries contained in the log book which he was required to keep in substantiation of the performance of his duties.

Maholland, the chief mate, testified that he first examined the sea suction valves while the ship was at Sinclair, and stated that they were closed but not yet sealed as the vessel was still loading cargo. At Shell, after the ship had started loading aviation gasoline, Maholland said that he checked the sea suction valves and found them closed, chained and sealed, and contends that he tested same by putting a wrench on the wheel of the valve handle. Later, after loading and making ready for sea, he again used a wheel wrench and, according to his statement, the sea suction valves were closed, chained and sealed.

The seals were made of small strips of iron coated with tin, similar to the tin used in a tin can. After the vessel was placed in dry dock, following its year's rest on the bottom of the harbor, the seals were missing. Whether this was due to rust, exposure to sea water, the weight of the chains which the seals held together, or the explosions at the time of the fire, is unknown. Manifestly, there were adequate reasons why the seals would break and fall into the debris in the bottom of the pump room.

## THE VOYAGE TO MOREHEAD CITY AND DOCKING AT AVIATION FUEL

The POTOMAC departed from the dock at Houston at 5:25 a. m. on September 21, 1961, and proceeded for Savannah, Georgia, holding a fire and boat drill on her first day out of port, at 3:20 p. m., September 22, 1961. She arrived at the Southland Oil Corporation Terminal in Savannah at about 7:33 p. m. on September 24, 1961, where, according to Maholland, her sea suction valves were examined and the seals thereon found intact. While at Savannah, the POTOMAC discharged all her JP–4 jet fuel from the No. 7, No. 8 and No. 9 tanks, and discharged a partial cargo of aviation gasoline, emptying the deep tanks, all of the No. 1 tanks and the No. 2 center tank.

Departing from the dock at Savannah at 8:10 p. m. on September 25, 1961, the vessel proceeded for Morehead City, North Carolina, arriving off the More-

9. The valve sealing certificate was retained on board the vessel until completion of discharge and was apparently executed in Morehead City, but was thereafter lost in the fire.

head City bar at 1:54 p. m. on September 26, 1961. She was met at the sea buoy by pilot A. T. Piner of the Morehead City Pilots Association, who with the assistance of the Tugs MANIE and A. T. PINER brought her into Morehead City harbor, where she was tied up starboard side to the fuel dock of Aviation Fuel Terminals, Inc., at 3:10 p. m.

The harbor of Morehead City consists of a dredged turning basin where the Newport River meets Bogue Sound, before emptying through Beaufort Inlet into the Atlantic Ocean. The harbor is bounded on the east by Radio Island, on which the facilities of Aviation Fuel Terminals are located, with its upstream limits defined roughly by a causeway-type highway bridge and an adjacent railroad trestle nearly one-half mile long, crossing the Newport River between Morehead City and Radio Island, about 700 yards north of and inland from Aviation Fuel's dock.[10]

Both the highway bridge and the railroad trestle have drawspans near the Morehead City side of the river, to permit passage of traffic along the Intracoastal Waterway, which follows the Newport River and then turns at a right angle in the harbor so as to follow Bogue Sound to the west and down the coast. The Aviation Fuel dock is roughly opposite the entrance to Bogue Sound and the town of Morehead City, where the North Carolina Port Authority has wharves extending along the north side of the Sound and along the Newport River across from Radio Island.

Aviation Fuel Terminals, Inc., at whose facilities the POTOMAC had moored, had contracted with the United States to provide certain services for the storage and handling of Government-owned petroleum products, promising to perform "in accordance with the best commercial practices." Its petroleum storage facilities consisted of a tank farm of 10 large floating roof storage tanks, divided into three isolated systems to handle three grades of light fuel; grade 115/145 aviation gasoline, JP–4 jet fuel, and JP–5 jet fuel.

As part of its contract, Aviation Fuel was required to unload fuel from tankers, and to provide a berth at which such tankers could "always be safely moored and afloat with the necessary access thereto," for which the United States had paid Aviation Fuel dockage and wharfage charges.[11] Its docking facilities consisted of a pier about 300 feet offshore, and essentially parallel to the shoreline, to which it was connected by a trestle over which ran three large pipelines terminating at valves and hose connections on the dock.

There was one pipeline for each grade of fuel, the one to the south (or seaward) being the JP–5 line, the center line being used for aviation gasoline, and the line to the north (or inland) being used for JP–4. The POTOMAC's cargo was to go through the south and center lines into shore tank No. 1, used to store aviation gasoline, and into shore tank No. 2, used for JP–5 jet fuel.[12] These two tanks each had an 80,000 barrel storage capacity, and were the storage tanks closest to the dock, being located about 150 feet from the shoreline.

The dock proper was about 80 feet in length, and was connected by catwalks to a set of two breasting dolphins on either

10. Directions at Morehead City are quite confusing, because the Atlantic coast at this point is running almost exactly in an east-west direction. Ships enter Morehead City harbor from the south, with Radio Island to their right, Bogue Sound to their left, and the highway bridge dead ahead to the north.

11. The contract provided that dockage and wharfage charges would be eliminated after 10,000,000 barrels of fuel had passed over Aviation Fuel's dock, which under the guarantee provisions of the dockage clause, would necessarily occur within five years of the contract date. The barrelage ceiling seems to have been met in the summer of 1960, by which time Aviation Fuel had been paid $350,000 in dockage and wharfage charges.

12. The JP–4 system was not used in discharging the POTOMAC's cargo, but the pipeline leading over the water to the dock was filled with JP–4 jet fuel up to the dockside connection at all times.

side, so that the entire structure was about 190 feet long. At a distance of 130 feet and 230 feet to both the north and south of the outermost breasting dolphins were two mooring dolphins, sitting out in the water 60 feet behind the line of the pierhead, with no means of access except by boat, which Aviation Fuel did not provide. The original plan for the dock's construction and the Army Corps of Engineers' permit therefor both called for a catwalk or other means of ready access, but the dock was not built in conformity with those plans or with the permit. However, there was apparently no complaint ever registered as to the construction design.

For fire protection, there was a fire main leading out to the dock, with a pump and hydrant on the trestle about 35 feet away, but the facility had failed to install an emergency diesel generator on its premises or provide for any other source of emergency power, so that their fire equipment could not be operated in the event of a power failure.[13] On the dock were four 50-foot lengths of 2½-inch fire hose, which require two men to handle, and five 5-gallon cans of foam with a foam applicator whose range was 100 feet already attached. There were axes available to cut mooring lines, and there was sufficient hose that with the foam applicator, a blanket of foam could have been placed on the water around the bow of a ship moored to its dock.

## THE DISCHARGE OPERATIONS

On arrival at Morehead City, the POTOMAC was carrying JP–5 jet fuel in her No. 3 and No. 4 cargo tanks, and aviation gasoline in No. 5 and No. 6 across and her No. 2 wing tanks.[14] Her draft on arrival was about 20 feet, 9 inches forward and 20 feet, 1 inch aft.

The vessel was tied up to the dock, starboard side to, with 10 mooring lines. There were two bow lines to the northernmost mooring dolphin, and a breast line leading to the mooring dolphin nearer the dock, all of which had been led by boat, since there was no other access. There were two stern lines and a breast line aft which led to the inaccesible dolphins to the south, and the remaining spring lines were made up to the breasting dolphins connected to the pier. As she was made fast, her bow was positioned opposite a point roughly midway between the mooring dolphins to the north, a distance of about 275 feet from the manifolds on the dock.

The POTOMAC gave notice of readiness to discharge cargo at 3:10 p. m., and was thereupon boarded by Aviation Fuel personnel, who took cargo samples and gauged the ship's cargo tanks. The local Department of Defense petroleum quality control representative, William M. Maull, came aboard and went into the pump room to examine the sea suctions. There is no contention that any wrench was applied to the valves at this time. As reflected in the cargo receiving documents, he found the seals intact with numbers corresponding to those appearing on the cargo documents forwarded from Houston.

In the meanwhile, preparations were being made to connect up the cargo hoses, which belonged to and were furnished by Aviation Fuel. The cargo hoses consisted of three 25-foot lengths, connected by bolt flanges into one hose, 75 feet in length. The cargo hoses were supported by two booms with straps, one on the dock and one on the ship, to keep the sag out of them where they were suspended in the air.

---

13. There was no way that the Fire Department could be called from the dock, because there is no telephone there. There is an intercommunication system connecting the dock and the office, and messages can be relayed outside the premises so long as someone is present in the office.

14. The quantity of cargo remaining on board the POTOMAC on her arrival at Morehead City was 57,177.50 gross barrels (or roughly 2,400,000 gallons) of aviation gasoline, and 45,013.60 gross barrels (or roughly 1,890,000 gallons) of JP–5 jet fuel.

Under Coast Guard regulations, 46 C.F.R., section 35.35–30, the terminal superintendent has the right to satisfy himself by personal inspection that "sea valves connected to the cargo system [are] closed" before commencement of cargo discharge operations. Aviation Fuel's superintendent, G. L. Bennett, chose not to make any such inspection. The regulation is obviously not mandatory. As soon as the cargo samples had been tested, Bennett gave the signal to start discharging the cargo. Discharge of aviation gasoline started at 5:20 p. m., and 20 minutes later, at 5:40 p. m., discharge of JP–5 commenced.

After the ship had docked, the customary in-port watch was maintained on board, consisting of an oiler, a fireman, and a relief engineer in the engine room, and three deckhands (two able-bodied and one ordinary seaman), a pumpman and a relief officer on deck. Those not on watch were free to go ashore or remain on board, and many of the officers and crew had gone off the vessel on shore leave. The night relief mate was Richard W. Cantwell, Jr., a graduate of the Kings Point Merchant Marine Academy, and a licensed second mate who had previously sailed on tankers and had acted as a tanker night mate on 50 or 60 occasions. He reported on board at about 5:30 p. m., just after the discharge of aviation gasoline had started and prior to discharge of the JP–5 jet fuel. After he advised both the chief mate and the master that this was the first T–5 tanker he had been aboard, the master told the chief mate to remain around and neither he nor the chief mate went ashore.

When the cargo discharge operation commenced, the POTOMAC was discharging aviation gasoline from her No. 5 and No. 6 cargo tanks through the port inboard suction line with the port inboard cargo pump. The JP–5 jet fuel was being discharged from the No. 3 and No. 4 cargo tanks through the starboard inboard suction line by the starboard inboard cargo pump. This left the chief mate with the problem of how to discharge the aviation gasoline remaining in his No. 2 wing tanks.

He could not use his starboard outboard system, of which the No. 2 tank was a part, because there was only one hose and one dock connection for handling aviation gasoline, and that was being used on the port inboard system from the No. 5 and No. 6 tanks. Nor could he use the upper or lower crossover lines in the pump room to interconnect the starboard outboard and port inboard systems, because the JP–5 jet fuel was being discharged through the starboard inboard system between them, and such an interconnection would contaminate both cargoes. The only alternative open to him, short of waiting until No. 5 and No. 6 were empty and then shifting cargo hoses, was to use the sea suction crossover as a transfer line, and this was the method he decided to follow.[15]

Maholland was aware that this was a risk, but he apparently thought that the procedure would be reasonably safe *provided* the sea suction valves were closed. He testified that when he made his final check of the pumproom, he applied the wrench to the sea suction valves.[16]

About 10 minutes after commencing discharge of JP–5, or at about 5:50 p. m., Maholland testified that he sent the night mate up forward to open the valves which connect the No. 2 wing tanks with the starboard outboard suction line, and also sent chief pumpman Mixon back into the pumproom to open up the necessary valves there. Mixon then went down and opened the drop valve between the starboard outboard suction line and the sea

---

15. Maholland did not advise the master and the master did not know that Maholland was going to use the sea line. Neither the master nor Marine Transport Lines' marine superintendent consider use of the sea line for this purpose a good practice.

16. Apparently it was Mixon's idea to use the sea line as Maholland asked Mixon how the No. 2 wing tank could be discharged and Mixon responded. Mixon incorrectly assumed that block valves were just inside the sea suction valves.

suction crossover, and then the drop valve between the port inboard suction line and the sea suction crossover, thereby placing the suction of the port inboard cargo pump on the sea suction crossover line, and finally, the crossover valve in the sea suction line. Mixon then came up on deck, went forward to make certain that the night mate was opening the correct valves, and watched the night mate and two seamen open up the valves to the No. 2 wing tanks.

It was at just about 6:00 p. m. that the No. 2 wing tanks were open and commenced discharging. Shortly thereafter, Maholland went ashore to make a telephone call from the tank farm office, and then came back to the ship. While he was gone, Mixon asked to be relieved by second pumpman Matamala, who did so between 6:16 and 6:20. Chief mate Maholland prepared to turn in, but before he did, he made one final check of the pumproom, at around 6:20 or 6:25 p. m., at which time he was alone. He testified that he again put a wrench on both sea suction valves, and again found both of them closed, chained and sealed.

Aviation Fuel's superintendent Bennett and plant manager Murphy left the tank farm at 6:20 p. m., leaving only two employees on the premises, one of whom was night watchman Sewell, whose functions were essentially janitorial. The other person was L. B. Willis, one of Aviation Fuel's foremen, who had been on duty since 7:00 a. m., and was expected to carry out all the functions of a petroleum storage terminal unloading a tanker at its facilities. One of his duties was supposed to be that of a dock watch.

Willis had other duties to perform. One of these required him to go up into the tank farm once an hour to obtain gauge readings from the terminal's storage tanks into which product was being pumped, and to calculate the pumping rate and ascertain the quantity of fuel that had been discharged. His routine

was to take cargo samples from each line, and then go take readings from his shore tanks, timing it so as to arrive at the base of the tank on the hour. He accordingly left the dock about 2 or 3 minutes before 6:20 p. m., an hour after discharge of the aviation gasoline had commenced, and took gauge readings from both the shore tanks which were receiving the product.

Returning to the dock, he made his calculations, called Sewell on the plant intercom to have the figures recorded in the office, and then went up to give them to the ship. On his way, he noticed that his hoses were sagging a bit, and got a member of the ship's crew to raise them with the ship's boom for him. Instead of leaving the pumping figures with the deckhand on watch and returning promptly to his post, however, Willis went on up to the second deck of the amidships superstructure to the officers' lounge, where he ran into night mate Cantwell entering to make his log entries and put on a pot of coffee. While the coffee finished perking, Willis waited and had a cigarette, leaving the dock unattended.

Assuming that the port sea suction valve was open,[17] the evidence is without contradiction that, when Mixon opened the valves in the pumproom thus permitting the aviation gasoline from the No. 2 wing tanks to flow into the sea line, some of the gasoline commenced to gravitate out into the harbor through the port sea chest which was located on the flat bottom of the ship about halfway between the turn of the bilge and the keel on the port side. The movement of the flood tide could reasonably cause this gasoline to rise to the surface of the water near the forward portion of the vessel. The elevation of the gasoline in the tank was approximately 23 feet higher than the sea water and it is logical to assume that the flow of gasoline would continue until the level of the tank product was reduced to the level of the sea water.

17. This factual finding is essentially conceded in the brief of the United States as there is no dispute that the port sea suction valve was found to be open when the vessel was inspected months after the fire.

## THE FIRE AND EXPLOSIONS

Up to the time that Willis boarded the POTOMAC, there was no obvious indication of anything out of the ordinary. It was a warm September evening, with the air temperature recorded at 81 degrees, the water temperature logged at 80 degrees, and the wind from the south at about five knots. The tide was at maximum flood current, the speed of which according to Morehead City pilot A. T. Piner was from 2½ to 3½ knots. Under the tidal conditions then existing, according to pilot Piner, it would take about ten minutes for something to float on the flood current from the place where the POTOMAC was moored past the bridges to the north. However, what must not be overlooked is the fact that there was apparently nothing to ignite the fuel until the fishing boat containing the open flame lantern entered the danger area as hereinafter indicated. Thus, the approximation of ten minutes floating time is not of great value.

Underneath those bridges, which were about 700 yards from Aviation Fuel's dock, two groups of sport fishermen were preparing to fish from small outboard motorboats which they had rented. In one of them, carrying the Stone party, Donald Stone began smelling gas fumes of some kind as they reached the end of Bunch's pier, while they were proceeding from Radio Island toward the drawspan. They passed out of the area, but after they had gone through the drawbridge, and headed back toward Radio Island, he happened to raise up a gas lantern, and it was suddenly surrounded by fire. It went out when he brought it back down, but he then began smelling gas fumes again and saw another ball of fire underneath and between the railroad trestle and the highway bridge. At this point everything caught fire, with flames spreading upstream about 100 yards, between him and Radio Island.

A similar phenomenon was experienced by the boat carrying the Massengills and Wade Stanley, who found the fumes so unpleasant that they were heading back to shore. They had an open-flame Coleman gas lantern in the bottom of their boat, and as they were going underneath the highway bridge from the railroad trestle, they were suddenly surrounded by a flash of fire, from which they all sustained varying degrees of injury.

At about this time, the POTOMAC's chief engineer Norris Nations and second assistant engineer Craig were walking through Aviation Fuel's tank farm going ashore. As they were roughly opposite shore tank No. 1 about 150 yards from the water's edge, they began smelling a strong odor of gas and then observed a small blue flame under the causeway, about one-third of the way out. As they watched, the blue flame grew in size and moved rapidly toward the Radio Island shore, and then began following the general direction of the shoreline. Nations and Craig ran back to the ship, and proceeded into the engine room. The last time they observed the fire was when they were running down the trestle toward the ship, at which time it was in a bay about 400 yards away.

In the meanwhile, the fire had been observed from the ship, and the alarm shouted. Night mate Cantwell first saw the fire off his starboard bow by one or two points of the compass when it was on the causeway, and when he observed it beginning to work towards him he called the chief mate and gave orders to stop the pumps and close down the deck manifolds. At about the same time, both Chief Mate Maholland and Captain Hunter looked out, and saw a blue flame off their starboard bow about a quarter of a mile away coming right along the beach toward them. Maholland ran down to the deck to help the night mate secure the manifolds, ascertained that the cargo pumps were off, and then ran up to the bridge to sound the general alarm.

Captain Hunter had meanwhile gone directly to the bridge, planning to get the ship underway, had called down to the engine room ordering them to get ready to get underway immediately and give him all available steam, and then ordered the engines full speed astern. At about this point, chief engineer Nations arrived

in the engine room to find the fire pumps started and the necessary preparations being made for an emergency departure, and Nations set his throttles for 60 revolutions, full astern, in response to the Captain's order.[18]

It was at this juncture that Maholland arrived, and Captain Hunter ordered him to get all the lines off. Maholland ran back to the manifold where the night mate was trying to disconnect the cargo hoses, and ordered him to throw off the after lines. Maholland then proceeded forward, threw off the spring lines, and then went up on the forecastle deck forward of the deep tanks. He began working on the breast line, and had it about halfway off, when he testified that flames higher than his head leaped over the starboard bow where he was working, driving him back.

The approach of the fire was observed by the crew of the tugboats MANIE and A. T. PINER, who were in the turning basin of Morehead City harbor at the time. Four crew members of these tugs testified that they observed the fire when it was about halfway between the high-way bridge and the POTOMAC, and watched it until it seemed to disappear behind the POTOMAC's bow on her starboard side, between the ship and the dock. As they continued to watch, they saw the fire reappear in a matter of seconds when it flared up from her starboard side, just forward of her amidships superstructure, and begin to flame over her decks.[19]

Similar observations were made by others. Leon Clifton from the railroad

trestle watched the fire go down the ship's starboard side near the point of the bow, as did the witness Wayne Sowers.[20] The ship's purser Newton saw the fire coming down the starboard side of the ship towards the midship section, and seaman Nelson saw a ball of orange flame proceeding toward the dock area underneath the pipe lines. Seaman Lee, pumpman Mixon, and Captain Hunter all observed the fire come between the ship and the dock as far aft as the gangway and the manifolds. On these facts, according to Aviation Fuel's expert Prussing, there would have then been a large quantity of petroleum product present on the water between the ship and the dock, although he also said that the condition of the steel on the port side showed evidence that the fire had been more intense on the port side than on the starboard side.

In the event of an oil spill during discharge, it is the duty of a fuel terminal's dock watch to warn the ship and then either to drive it away with water or blanket it with foam. The instructions given by terminal superintendent Bennett to dockman Willis were that in the event of a spill, he was supposed to shut down the ship, find out where the spill was coming from and, if possible, stop it.

It is agreed that, if Willis had been on the dock, he would have been in the best position to detect a spill on the water between the ship and the dock or, if not Willis, then another dock watcher should have been on duty to the end that the dock would not be left unattended at any time. The port sea suction block valve

18. The steam smothering system, which was in good operating condition and had been activated and tested only two days earlier, was not turned on, because the master had not ordered it. Captain Hunter did not want the steam smothering system turned on, because under normal in-port steaming conditions, there is not enough steam to permit both an emergency departure and activation of the steam smothering system. Captain Hunter chose to attempt to get the ship underway, which Aviation Fuel's expert Prussing agrees should be the first concern of the ship's officers in these circumstances.

19. Morehead City pilot Piner had just finished docking the Tanker PALLIUM, and was still on board her when he saw the fire. He did not see it after it got closer than 600 or 700 feet from the POTOMAC's bow, but observed that the fire extended 150 to 200 feet north of the causeway. He fixes the time of the fire's outbreak at about 6:45 p.m.

20. Sowers testified that he ran out to the Radio Island edge of the railroad trestle and observed a "blue streak" take off from the body of fire under the bridge, headed for the vessel, and hitting it directly on the bow.

was opened by Mixon at approximately 6:20 p. m., according to Maholland. The fire broke out at approximately 6:45 p. m.

While better commercial practice would seem to require the services of two men—one of whom would have the duty of a yard gauger with the attendant duty of boarding the ship to advise the proper ship's officer as to the rate the cargo was being pumped ashore; the other remaining on the dock at all times—there is certainly nothing that could have been done by either dock watcher which would have prevented the spill or, in fact, prevented the fire. As soon as the fire was discovered, Willis heard the order to close down the pumps on the ship. He ran to the dock, called the watchman in the office, stood by the valves on the pier with his foot on the hose until he could feel that the pumping had stopped, and then started to close the valve in his line. Before he could get this valve closed, the fire was too close and had almost reached the ship. He then ran to the next set of valves at the pump block, approximately 50 feet from the inshore end of the pier, and closed the valves in two lines. About that time the fire struck the bow of the vessel.

To spray the water, dock and ship with foam at this final moment would have been a fruitless effort, to say nothing as to the risk of life involved in such a procedure. We cannot attribute negligence to what Willis did or failed to do under the existing circumstances.

The foregoing does not, of course, answer the argument that Willis, or an additional dock watcher, *might* have detected the spill on the water in time to have taken some action which *may* have prevented the disaster or otherwise lessened the damage.

While there is evidence that the fire headed generally in the direction of the starboard bow, we must remember that any dock watcher would have been sev-

eral hundred feet from the vessel's bow. It is far more likely that a member of the ship's crew would have first observed any spillage of gasoline. There is no evidence as to how close the product approached the pier and no testimony that there were any leaks in the hoses and lines adjacent to the pier. Since the gasoline was being discharged from an opening in the flat bottom of the vessel on the port side, and since there was no vertical keel which would have retained the product on this side of the ship, it is logical to assume that the flood tide may have carried some of the fuel toward the starboard bow as it gradually rose to the surface, but this does not necessarily mean that it would have flowed to the immediate area of the pier.[21] From the evidence we must conclude that there was gasoline on the surface of the water off both the port and starboard bow of the vessel.

■ We feel that it would be sheer speculation to find that the presence of an additional dock watcher or Willis' presence on the dock would have in any manner prevented or lessened the disaster. We decline to accept the invitation to find Aviation Fuel negligent to the extent of determining that such negligence was a proximate cause of the fire and resulting damage. Indeed, Creed, the Supervising Inspector of Naval Material, testified that, at none of the commercial terminals with which he was familiar, did they maintain a dock watch of more than one man after the gauging had been completed and the pumping commenced. Since the pumping started at 5:20 p. m.—at least 40 minutes before the No. 2 wing tanks were opened—the presence of an additional dock watcher, according to Creed, was not customary.

After Willis closed the valves in both the aviation gasoline and JP–5 lines at the pump block, and at about the time the fire reached the ship, Willis moved his automobile towards the office, stopping

21. Guthrie, the bridge tender operator, who was called as a witness by the United States, was in an excellent position to observe the path of the fire. He stated

that the fire went directly to the port bow, about midway between the midship house and the bow.

at the fire side of the No. 1 storage tank and entering the tank farm. At this moment he heard a tremendous explosion, after which he ran and closed the valves at the base of the No. 1 and No. 2 storage tanks, and then removed his car to a point outside the gate and off the terminal premises.

At about the same time, Captain Hunter left the POTOMAC's bridge, after first telling the radio operator Salopek to get moving back to the stern, and went forward to get Maholland off the bow. When he got there, he ordered Maholland back, telling him they could not save the ship, but that they should try and save the crew. The master and chief mate then went aft, going down to the main deck on the port side from the midships house because flames were coming over the starboard side and licking up over the catwalk. They then went through the crew's quarters in the after superstructure getting the crew out, and when they got to the fantail they found about 12 men assembled there. At this time, there was a large explosion forward of the amidships superstructure, probably in the deep tanks.

Captain Hunter then ran to the engine room hatch and ordered his engineering watch to stop the engines and come out on deck. As soon as he saw that the screws had stopped dead in the water, Hunter gave the order to abandon ship and his crew began jumping or sliding down lines into the water, until only the chief mate and Hunter remained, and then they went over the stern.

Most of the crew made their way to the mooring dolphins and some of them swam ashore to the beach. Others were picked up by a Coast Guard boat or by a small fishing boat which came in and retrieved them. As the fishing boat was about halfway across the harbor, there was a severe explosion on the POTOMAC, apparently in her No. 7, No. 8 and No. 9 tanks, which opened up the ship and caused her to settle to the bottom. The POTOMAC and her cargo burned thereafter for about ten days and became a total loss.

## WAS THE PORT SEA SUCTION VALVE SEALED IN AN OPEN CONDITION?

By inference, at least, the United States contends that the second pumpman, Matamala, who was in the pump room after Maholland had departed, opened the port sea suction valve. Matamala testified by way of deposition and emphatically denied having opened this valve.[22] Despite the discrepancy shown in the footnote, it is clear that Matamala had no motive or reason to tamper with the valve. Obviously, however, the valve had been opened at some time as evidenced by the discovered position of the port sea suction valve when the vessel was raised and placed in dry dock.

We believe that a fair review of the evidence will demonstrate that it is just as likely that the port sea suction valve was sealed in an open position at the time the POTOMAC departed from Houston, Texas. The last known opening of the port and starboard sea suction valves was when the vessel pumped out most of the sea water ballast prior to her arrival in Galveston Bay en route to Houston. The party who allegedly closed these valves was the former chief pumpman who was not called as a witness. In any event, his work was not checked by the then chief officer, Forman.

 This pertinent issue, essentially controlling on the right to limit liability, is governed by the burden of proof in such matters. The parties are in agreement that the initial burden of proving negligence or unseaworthiness rests upon the claimant or claimants in a limitation

22. At his deposition Matamala said that he did not look at the sea suction valves and could not say whether they were open or closed. Apparently prior to the deposition he had told counsel for the United States, in the presence of his own attorney, that he had looked at the sea suction valves and they were closed. He also testified that these valves were closed at the time of the Coast Guard hearing shortly after the disaster.

proceeding. The 84-H, 296 F. 427 (2 Cir., 1923), cert. den. 264 U.S. 596, 44 S.Ct. 454, 68 L.Ed. 867 (1924); Walston v. Lambertsen, 349 F.2d 660 (9 Cir., 1965), cert. den. 382 U.S. 980, 86 S.Ct. 553, 15 L.Ed.2d 470 (1966); Coleman v. Jahncke Service, Inc., 341 F.2d 956 (5 Cir., 1965), cert. den., Jahncke Service, Inc. v. Greater New Orleans Expressway Commission, 382 U.S. 974, 86 S.Ct. 538, 15 L.Ed.2d 465 (1966); Petition of Cherokee Trawler Corp., 157 F.Supp. 414 (E.D.Va., 1957); The Titanic, 225 F. 747, 141 C.C.A. 19 (2 Cir., 1915). However, once negligence is established, the burden rests upon the party seeking to limit liability to prove seaworthiness and lack of privity. *The 84-H,* supra.

 The evidence abundantly establishes negligence on the part of the shipowner. While we believe that negligence has been established by reason of a crew untrained in the operation of a rather unique piping arrangement in the pump room, we prefer to rest this finding on the open port sea suction valve. If, as the United States strongly intimates, the port sea suction valve was opened by Matamala about 10 minutes prior to the outbreak of the fire, then this was negligence on the part of Matamala which is attributable to the United States, but which would apparently not disturb the right of the shipowner to limit its liability.[23] If, as suggested by Aviation Fuel and other claimants, the port sea suction valve was sealed in an open position by the former chief pumpman, this was likewise negligence attributable to the shipowner and, in addition, created a condition of unseaworthiness which existed at the outset of the voyage from Houston, all of which would bar any right to limit liability. There is no merit to the argument that, again assuming Matamala's act in opening the port sea suction valve, the act was not in the furtherance of the business of the shipowner in the absence of a showing that Matamala intentionally committed a criminal act. A mere act of negligence on the part of the servant, which results in a loss or liability vested upon the master, does not exonerate the master.

While it is perhaps true that the quantity of the testimony reflects that several individuals applied a wrench to the sea suction valves for the purpose of determining whether the valves were closed, the quality of such evidence must likewise be considered in ascertaining whether the shipowner has met the burden of proof required by law. We hold that this burden has not been met. In light of this holding, it is unnecessary to make a specific finding with respect to who opened

23. We need not venture into any realm of speculation with reference to the effect of instantaneous unseaworthiness or operating negligence being tantamount to unseaworthiness as the same applies to the right to limit liability. Under 46 U.S.C., sec. 183(e), in matters touching loss of life or bodily injury, the privity or knowledge of the master or of the superintendent or managing agent of the owner, at or prior to the commencement of each voyage, is deemed *conclusively* the privity or knowledge of the vessel's owner. While the foregoing applies to a "seagoing vessel," and the United States contends that the POTOMAC was a "tank vessel" and, therefore, not within the category of a "seagoing vessel," this subject is discussed in footnote (4), infra. Under 46 U.S.C., sec. 183(a), the owner, if without privity or knowledge, may limit his liability, except as provided in sec. 183(b), to the value of the owner's interest, as the interest is shown after the catastrophe, plus her pending freight. Thus, "privity or knowledge" as prescribed by 46 U.S.C., sec. 183(a) need not necessarily be in existence at the commencement of the voyage. We must assume, arguendo, that authorities such as Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960), and Venable v. A/S Det Forenede Dampskibsselskab, 399 F.2d 347 (4 Cir., 1968), do not change the long-existing law on "privity or knowledge" as the same applies to the right to limit liability. Indeed, the brief *per curiam en banc* opinion on the petition for rehearing in *Venable* considerably weakens the force of the majority opinion and, in effect, holds that operational negligence does not constitute unseaworthiness in all cases, but that the same remains a question of fact.

the port sea suction valve and for what purpose as related to the claims of the POTOMAC's crew.

■■ It is true, of course, that the United States is not liable under concepts of unseaworthiness to the Massengill fishing party, the owner of the damaged railroad trestle, or Aviation Fuel as the dockowner. Those who are not a member of the ship's company, nor of that broadened class of workmen to whom the admiralty law has extended the absolute right to a seaworthy ship, are not entitled to recover on any basis of unseaworthiness but must rely upon negligence. Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed.2d 550 (1959). However, even if the United States is entitled to limit its liability, the injured parties on the Massengill fishing boat have a fund created for their benefit under 46 U.S.C., sec. 183(b) which is more than adequate.

Since the Court has found that the shipowner has failed to meet the burden of proof required to demonstrate that Matamala was the party guilty of opening the port sea suction valve, and since it is obvious that this valve was open with the resultant spillage of product, the only other logical alternative is that the port sea suction valve was sealed in an open position. While such an act undoubtedly created an unseaworthy condition of the vessel, it was equally a negligent act attributable to the United States. For these reasons, and since the shipowner is precluded from limiting liability, the owners of the railroad trestle and Aviation Fuel may recover on the theory of negligence.

■■ We could go further and state that, even if Matamala or some other crew member opened the port sea suction valve after the vessel left Houston, this act of negligence may properly relate back to the commencement of the voyage in that the POTOMAC was equipped with a unique piping arrangement and no effort was made to acquaint the pumpmen with the inherent dangers attendant to its operation. It was clearly the duty of the shipowner to not only provide a crew sufficient in numbers, but also a crew competent for the duties it may be called upon to perform, including provision for any exigency which is likely to happen. In re Pacific Mail S. S. Co., 130 F. 76, 82, 69 L.R.A. 71 (9 Cir., 1904); Admiral Towing Company v. Woolen, 290 F.2d 641 (9 Cir., 1961). Such a failure may constitute both negligence and unseaworthiness. Waldron v. Moore-McCormack Lines, Inc., 386 U.S. 724, 87 S.Ct. 1410, 18 L.Ed.2d 482 (1967). We do not hold that the pumpmen were *per se* incompetent, nor that they were not qualified in the performance of duties on a T–2 or other similar class tanker. However, with only four T–5 tankers in existence and with these T–5 tankers being equipped with a unique piping arrangement which did not have the customary safety block valve, appearing on other vessels, it seems logical to assume that the shipowner, or its operating agent, Marine Transport Lines, had the duty of warning otherwise experienced pumpmen with respect to the potential danger existing by reason of the use of the sea suction crossover as a transfer line. Acknowledging that shipowners and their operating agents must obtain their crews from a Union and, for this reason, their opportunity for selection is essentially limited—which, standing alone, would not bar the right to limit liability, Coryell v. Phipps, 317 U.S. 406, 63 S.Ct. 291, 87 L.Ed. 363 (1943), Admiral Towing Co. v. Woolen, supra—this affords no answer to this case. Until such time as the T–5 tanker with its piping arrangement, had become universally accepted by pumpmen, we think that there existed some duty on the part of the shipowner or its operating agent to familiarize pumpmen, unacquainted with the operative effects of the piping arrangement, with the potential danger always existing under the circumstances. Negligence or knowledge of the operating agent is, of course, binding upon the United States for purposes of the Limitation Act. Admiral Towing Co. v. Woolen, supra.

We turn, then, to the issue of damages.

## DEATH CLAIM—PETER SALOPEK

■ This decedent was the radio operator aboard the POTOMAC. At the time of his death[24] on September 26, 1961, he was 47 years of age, having been born on February 9, 1914. He had no wife or children, and his sole surviving eligible beneficiary was his mother, Agnes Salopek, who was born on July 25, 1891, and was 70 years old when the decedent met his death.

Salopek's tax returns reflect that he claimed his mother as a dependent with average annual contributions of $1,333.-75 for the four calendar years prior to his death, with the largest annual contribution being $1,400 in 1960, and the lowest being $1,290 in 1958. His average annual earnings for the same four-year period were $7,055.88, with a high of $9,800.98 in 1957, and a low of $4,976.84 in 1958. The calendar year prior to his death resulted in earnings of $6,053.49.

On the voyage prior to the one in question—from July 21, 1961, to September 15, 1961—Salopek's gross earnings were $1,988.30, from which an allotment in the sum of $600 was deducted in favor of his mother.

We are not too much concerned with Salopek's life expectancy which, at the time of his death, was in excess of 25 years. It is certainly reasonable to assume that, under ordinary circumstances, Salopek would outlive his mother. Her life expectancy at the time of the fire was 10.12 years according to the Commissioners 1958 Standard Ordinary Mortality Tables.[25] We may assume that the mother would be entitled to the full pecuniary loss for at least the period of her life expectancy.

The mother testified that she was the recipient of $1,800 to $2,000 by way of annual contributions, plus a $500 per year vacation gift. No precise records, other than the claim for dependency in the tax returns and the allotment of $600 for the voyage prior to the disaster, are available. It is contended that the decedent, together with his brother, provided the housing accomodations for the mother, same being valued at $660 per year for the decedent's share of same. Claimant agrees, however, that the rental value of housing accomodations should be disregarded if the contributions by the decedent to a joint savings account in the name of the decedent and his mother are to be considered.

The joint savings account reveals the following:

| YEAR | DEPOSITS | WITHDRAWALS | INCREASE |
|------|----------|-------------|----------|
| 1957 | $1,864.06 | $900.00 | $ 964.06 |
| 1958 | 1,496.00 | 500.00 | 996.00 |
| 1959 | 1,031.00 | – | 1,031.00 |
| 1960 | 1,730.00 | 200.00 | 1,530.00 |
| | | Total increase | $4,521.06 |
| | | Average annual increase | $1,130.24 |

———◆———

24. Salopek's body was never found. He was apparently last seen by the master who instructed him "to get moving, get a life jacket, and go to the stern." We think that the evidence justifies a finding that Salopek was burned to death. This inescapable conclusion is derived from all of the physical facts, including the extent of the fire at the moment Salopek was last seen. While the United States urges that any award should be reduced by reason of Salopek's failure to go to the stern of the ship as directed by the master, we do not believe that this point merits discussion when we consider that there is a presumption, in the absence of evidence sufficient to dispel or rebut it, that the decedent, acting in the instinct of self-preservation, was in the exercise of ordinary care. 25A. C.J.S. Death § 80(2), p. 819.

25. The brief of the claimant suggests her life expectancy at age 74 to be 9.90 years. The brief of the United States states her life expectancy to be 4.12 years at age 76. The statutory mortuary tables of North Carolina, N.C.Gen.Stat., sec. 8–46, reflects that the life expectancy of a person 70 years of age is 9.96 years.

In 1961, there were no withdrawals but an additional $550 had been deposited. The closing balance in the account was $7,936.32; there having been an opening balance of $2,041.39 in 1956. The average annual increase over a five-year period (to the date of death) was $1,178.98.

There is no indication that the mother ever exercised her option to withdraw funds from the joint savings account; nor is there any claim of gift from son to mother of the deposited funds. By operation of law, the balance in the account became the property of the mother upon the death of Peter Salopek. The essence of the claim of the mother in regard to the savings account is that she has been deprived of the benefit of the power of withdrawal as to the potential increase in this account for the years of her life expectancy, including the reasonable expectancy that the son's annual contributions to the mother would be increased to some extent during the remaining years of her expectancy.

■■■ We are inclined to the belief that the documentary evidence as to the son's income tax returns is somewhat more persuasive than the mother's testimony indicating the average annual contribution with no records being maintained. In fixing the amount of the pecuniary loss to the mother, however, we believe that there is a reasonable expectation of pecuniary assistance or support which would have modestly increased over the period of the mother's life expectancy. Michigan Central R. R. Co. v. Vreeland, 227 U.S. 59, 70, 33 S.Ct. 192, 57 L.Ed. 417 (1913). While the law recognizes the propriety of considering, as an element of damages, the reasonable increase in the decedent's estate had he survived, such principles have generally been applied to the right of a beneficiary who is likely to outlive the victim, thus enabling the beneficiary to inherit from the victim had he lived a normal life span. Such is the case where widows and dependent minor children are involved. Just as courts frequently cut off the dependency of children upon attaining the age of majority, we do not believe that there is any reasonable expectancy that Mrs. Salopek would have inherited from her son had he continued to live; not because of any lack of affection on the part of the son, but due to her age and the normal expectancy of her life. There is, of course, always the question as to whether a widow would have outlived her husband had it not been for his death by accident but, as stated in O'Toole v. United States, 242 F.2d 308 (3 Cir., 1957), "But that is no harder to figure than the expectation of life for the decedent himself had he been permitted to live out his time." We hold, therefore, that as applied to the facts of this case, there is no reasonable expectancy that the mother would have survived the son and thereby inherited any potential increase in the son's estate.[26] See: Anno. 91 A.L.R.2d 477–489.

Nevertheless, the fact that the son demonstrated a steady pattern of deposits in the joint savings account, with an average annual increase of $1,130.24, is indicative of some reasonable expectancy of increased annual contributions from the son to the mother. Speaking from experience common to all, it is a recognized fact that as a person accumulates a larger estate, the objects of his affection to whom he has previously rendered financial assistance with a marked degree of regularity are likely to benefit therefrom.

Weighing all of the foregoing factors, we conclude that the mother's average annual pecuniary loss should be fixed at $1,600.00.

■■■ Prejudgment interest is expressly prohibited by the terms of the

---

26. We draw an analogy to the present situation in Bagley v. City of St. Louis, 268 Mo. 259, 186 S.W. 966 (1916), wherein the death action was brought on behalf of the decedent's mother and four half brothers and sisters. The mother died prior to trial. On appeal, it was held that the mother's action for loss of heritable rights abated upon her death.

Public Vessels Act, 46 U.S.C., section 782. The United States, therefore, concedes in its brief that the loss of contributions from the date of death to the date of judgment should not be subject to discount. While the case was heard in 1963, there were many delays including a delay of more than two years before the transcript was prepared by the official reporter who left this position several months after the trial.[27] Thus, it is likely that a final judgment will not be entered until approximately 7½ years after the tragic event which gave rise to this litigation. Unlike Gardner v. National Bulk Carriers, Inc., 221 F.Supp. 243 (E.D.Va., 1963), aff'd per curiam 333 F.2d 676 (4 Cir., 1964), where prejudgment interest was allowed and the pecuniary loss was discounted from the date of death, such a computation cannot be used in this case due to the prohibition of the statute. We will, therefore, accept the invitation of the United States to adopt the reasoning in LeRoy v. Sabena Belgian World Airlines, 344 F.2d 266 (2 Cir., 1965) cert. den. 382 U.S. 878, 86 S.Ct. 161, 15 L.Ed.2d 119 (1965), and allow in full the pecuniary loss from the date of death for a period of 7½ years, without discounting the value thereof.

 On this basis, we conclude that Agnes Salopek, Administratrix of the Estate of Peter Salopek, is entitled to a judgment against the United States of America in the sum of $28,303.89, with legal interest thereon from the date of said judgment. This is computed, in part, on the basis of $12,000 pecuniary loss for eight years without discount. As of March 26, 1969, the beneficiary will be nearly 78 years of age with a life expectancy of 6.59 years (Commissioners 1958 Standard Mortality Table). Fixing Mrs. Salopek's life expectancy at 7 years and computing the discount value at 4%, the pecuniary loss is $9,603.20, which is

rounded out at $9,600. We also feel that the evidence is sufficient to sustain the claim for conscious pain and suffering in light of the finding that Salopek was burned to death, and we fix this item of damages at $5,000. Furumizo v. United States, 245 F.Supp. 981, 1015 (D.Haw., 1965). The United States takes no issue with a claim for unpaid wages ($398.81), loss of moneys ($805.08), and loss of personal effects ($500.00), same aggregating $1,703.89.

## DEATH CLAIM–CLYDE V. LEONARD

Clyde V. Leonard was a crew member aboard the POTOMAC at the time of the fire and explosions heretofore mentioned. He was born on October 5, 1904, and, at the time of his death, was within a few days of being 57 years of age. He was survived by his widow, Mary Esther Ford Leonard, to whom he was married on May 20, 1934.

 Leonard's body was recovered. No one apparently saw him after the fire started. The death certificate reflects that the cause of death was probable pulmonary edema, secondary to inhalation of poisonous gas. An examination of the body did not indicate any burning with the possible exception of a place on the forehead. While death from burning sounds more gruesome than death from inhalation of poisonous gas, we cannot distinguish between the two primary causes of death from the standpoint of conscious pain and suffering. The just and reasonable inferences are that Leonard would have had some conscious pain and suffering prior to death as he was attempting to get air during his last moments. Consistent with the Salopek claim, we find that an award of $5,000 for this item of damages is fair and reasonable. Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 563, 51 S.Ct. 248, 75 L.Ed. 544 (1931); Civil v. Waterman Steamship Corp., 217

---

27. Even after the transcript had been completed, there were so many errors that it was a year later before the transcript was corrected. Other delays were occasioned by the interlocutory appeal

(footnote 2, infra); the necessity of hearing the Smith and Holley claims in 1967; and the lack of judicial manpower until September 1967.

F.2d 94, 99 (2 Cir., 1954). Unlike Gardner v. National Bulk Carriers, Inc., 221 F.Supp. 243, 246 (E.D.Va., 1963), aff'd per curiam 333 F.2d 676 (4 Cir., 1964), and Whitaker v. Blidberg-Rothchild Co., 195 F.Supp. 420, 424 (E.D.Va., 1961), aff'd per curiam 296 F.2d 554 (4 Cir., 1961), where the seamen jumped off the vessels in obvious attempts to commit suicide, with no showing of their state of mind immediately before leaving the ship and no indication as to whether they were living or dead when they hit the water, the reasonable inference in the present case is that Leonard, a man in good health, would have undergone conscious pain and suffering for an undetermined period of time prior to death.

Leonard's average annual earnings as an able-bodied seaman varied considerably.[28] The average annual income for the six years prior to 1961 amounted to $3,087. However, during the year of his death he had earned $5,023.98, or an average of $558.22 per month.

The widow testified that she received, by way of allotment or otherwise, the approximate sum of $300 per month.[29] The only other apparent income received by Leonard was doing delivery work for Norfolk Ice Cooperating Company on one or two occasions when not at sea. We fix the decedent's average annual gross earnings at $5,000, taking into consideration his past record of earnings as well as his income while serving aboard the POTOMAC,[30] together with the knowledge that seamen's wages are generally on the upgrade.

 The amount sent home while at sea does provide some guide for a determination of pecuniary loss, but it is not an absolute factor. We believe that a fair analysis of all of the evidence leads to the conclusion that Leonard's average contribution for the purpose of ascertainment of damages is $2,700 per annum, or $225 per month. This is calculated upon the assumption that his work record would fairly correspond with his 1961 activities, and would continue until reaching the age of 65. From this annual contribution we must deduct Leonard's "at home" personal expenses. O'Connor v. United States, 269 F.2d 578 (2 Cir., 1959). Bearing in mind that Leonard would be at home only during brief intervals and his personal "at home" expenses would be minimal, we find that the annual pecuniary loss sustained by Mrs. Leonard is $2,200.

Using the same 7½ year computation as with respect to the Salopek claim, we fix Mrs. Leonard's pecuniary loss to the date of Leonard's retirement age at $16,500.[31] At age 65 it is reasonable to assume that his working life expectancy as a seaman would be ended.[32] Certain benefits generally accrue to seamen by way of retirement and, in addition, a person may obtain some earnings doing

---

28. The gross earnings were as follows:

 1955—$2,026.44
 1956— 3,687.27
 1957— 4,284.07
 1958— 1,827.70
 1959— 4,564.66
 1960— 2,131.87

29. It is not clear from the record whether the monthly contribution of $300 is confined to 1961 or constitutes an average for prior years as well. Counsel's question to Mrs. Leonard refers to a "recent average." Obviously Leonard could not have contributed $300 per month during 1960, as such a contribution would exceed the gross annual earnings by nearly $1,500.

30. On a seven-month voyage aboard the POTOMAC ending in July 1961, Leonard's gross earnings were $4,654.81, and his allotments to his wife aggregated $975. He obtained advances aggregating $363.-50. Even if the advances were transmitted to his wife, the sum total of the allotments and advances amounts to $1,338.50, or slightly less than $200 per month.

31. Leonard's retirement age is approximately six months beyond the anticipated date of entry of final judgment.

32. The allowance of full pecuniary loss for 7½ years, plus an allowance of six months life expectancy computed at $1,058.20 (rounded out at $1,000), would be the equivalent of reaching the retirement age.

odd jobs. Had Leonard reached the age of 65, his expectation of life would be 12.90 years, or roughly 13 years. Undoubtedly Leonard's annual contributions to Mrs. Leonard would be substantially reduced at that time. Perhaps arbitrarily, but with no other guide to follow, the Court fixes Mrs. Leonard's annual pecuniary loss at $1,200 following retirement. The discounted value for 13 years at 4% amounts to $11,983.20, which has been rounded out to $12,000.

 We do not agree that the evidence justifies any consideration for an award for accumulations in Leonard's estate. Mrs. Leonard cannot recover for the economic value of decedent's life, in addition to her own pecuniary loss. Petition of United States, 367 F.2d 505, 511–512 (3 Cir., 1966), cert. den. Black v. United States, 386 U.S. 932, 87 S.Ct. 953, 17 L.Ed.2d 805 (1967). There is not a shred of evidence which indicates any systematic saving as in Salopek; nor is there any evidence that Mr. and Mrs. Leonard did anything other than live to the full extent of their income. We believe that the same pattern would follow even though Leonard's employment had been regular and his income had increased.

A judgment may be entered in favor of Mary Esther Ford Leonard, Administratrix of the Estate of Clyde V. Leonard, deceased, against The United States of America, in the sum of $34,500, with legal interest thereon from the date of judgment.

### DEATH OR INJURY CLAIM— JOHN C. SMITH

In considering this claim the essential question is one of causation. Sarah Smith, Administratrix of the Estate of John C. Smith, argues that this is a death claim or, at least, an aggravation claim which, in whole or in part, contributed to Smith's death. We do not agree.

The deceased was third mate aboard the POTOMAC. He actually died approximately 9 weeks after the POTOMAC disaster. The cause of his death was lung cancer.

Smith was 65 years of age at the time of the fire. He had planned to retire in six or seven months. He was off duty when the fire broke out and, along with other crew members, assembled on the stern of the vessel when the order was given to abandon ship. He jumped about 50 feet into the water, swam to a mooring line, and was thereafter assisted behind a piling by the master and chief engineer. A small fishing boat threw the men a line and proceeded to tow them across the harbor. About that time the second and more severe explosion took place and the fishing boat increased its speed, thereby placing the three men under the water a portion of the time. It is estimated that Smith was in the water about 30 minutes.

Upon reaching shore, Smith was exhausted and remained flat in the truck which took him to the Public Health Relief Station at Morehead City. He was then removed to the Marine Corps Air Station at Cherry Point, a distance of 15 to 20 miles, where he was admitted at approximately 9:00 p. m. The hospital record reflects no burns, but he did have scratches on his lower legs from barnacles on the pilings, and he was suffering from a cold and soreness of the chest.[33] His heart and lungs were clear. Because of his weakened condition, Smith was retained in the hospital overnight, and discharged the following morning. He then went to his home in Largo, Florida.

On October 3, 1961, Smith reported to the Public Health Service Clinic at Tampa, complaining of a cough, nervousness and insomnia. He had appeared somewhat drawn, with a loss of appetite, when he returned to his home. He returned to the same clinic on October 9, 1961, when a notation was made that he was doing "fair." On October 11, 1961, he was given an x-ray examination of his chest

---

33. Smith apparently caught cold some two or three days prior to the disaster, and it had not been cured.

at the Mease Hospital, Dunedin, Florida, which revealed pleurisy of the right lung.[34] Smith was advised of this fact and, on November 8, 1961, entered the Mease Hospital where the admitting diagnosis indicated carcinoma of the left lung. The history disclosed a 20-pound weight loss over the previous several weeks, an acute lumbosacral back sprain originating within ten days,[35] shortness of breath and difficulty in breathing. Dr. Norton, the examining physician, referred Smith to Dr. Williams, a thoracic surgeon, who noted the progressive consolidation and retraction of the left upper lobe, *probably* occasioned by the tumor compressing the bronchus "rather than being related to the accident two months previous." A bronchoscopy report indicates a tumor mass displacing the lower trachea, corona, and left main bronchial branch downward and to the right. Smith left the hospital on November 11, with a final diagnosis of bronchogenic carcinoma of the left lung, and it was recommended that he return in ten days for exploratory surgery.

Smith was admitted to the United States Public Health Service Hospital, Savannah, Georgia, on the late evening of November 14, 1961. The x-ray of the chest on admission showed a large soft tissue density obscuring the upper half of the left lung field, with some pleural fluid at the left base.[36] The pleural fluid was withdrawn through the process known as thoracentesis, and a number of large cells were discovered which appeared to be neoplastic. Successive x-rays showed rapid enlargement of the upper lung mass and a further accumulation, or re-accumulation, of increased amounts of pleural fluid and, on November 26, 1961, this fluid was again removed. The doctors considered Smith's condition as inoperable and, on December 2, 1961, he expired from "carcinoma of the lung with pleural metastatis."

All of the medical experts agree that Smith had a malignant cancer in his left lung prior to September 26, 1961, when the disaster occurred. The admission history at Savannah reflects that Smith consumed an average of from one to three packs of cigarettes per day. Therefore, the claimant predicates her argument for recovery on the ground that the POTOMAC disaster accelerated Smith's death.[37]

The claimant rests her case on acceleration of death on the basis of statements from Dr. Koonce, a general surgeon who had never performed an operation for lung cancer, and Dr. Norton, the general practitioner at Mease Hospital, who referred Smith to a thoracic surgeon. Dr. Koonce stated that Smith's experience on September 26 and his "exposure to cold" could have lowered his resistance and hastened his death, but even then he declined to testify as to Smith's life expectancy or as to any causal relationship in fact. Dr. Norton testified that the disaster probably "hastened the progress of this fatal disease" but, on cross-examination, conceded that Smith's "demise was imminent," irrespective of his exposure to water, and that he had no opinion as to the extent to which his death was hastened.

The testimony of Dr. Ridgeway, who was Smith's attending physician during the two weeks prior to death, was em-

34. The notation refers to the right lung, but all symptoms were in the left chest and it may be assumed that the notation or transcript is in error.

35. Dr. Norton, the examining physician at Mease Hospital, does not attribute the lumbosacral back sprain to the POTOMAC disaster. He suggests that it was possibly caused by the metastatic spread from the lung malignancy.

36. There was no evidence of pleural fluid found at Mease Hospital, all of which would indicate a rapid progression of the lung cancer during the interim period.

37. Even if this theory should be accepted, the life expectancy tables would be meaningless. Such tables are of assistance in determining the average expectancy of life for one in otherwise normal health, but should not be applied with respect to one who is known to have a malignancy which is acknowledged to be incurable.

phatic in stating that the experience of September 26, 1961, had nothing to do with his death, and that Smith would have died "just as early as if he had not been exposed in the water." To the same effect is the testimony of Dr. Hotchkiss, a specialist in the field of thoracic surgery, who, while he never saw Smith, had reviewed the records at length. Dr. Hotchkiss concluded that Smith's death was totally unrelated to the events of September 26, 1961; that there was no evidence of aggravation; and that no causal relationship existed and that Smith would "have died at approximately the same time, whether the accident occurred or not."

██ We conclude from this record that the evidence is insufficient to merit a finding of acceleration of death, in whole or in part. Indeed, the preponderance of the evidence supports the view that the events of September 26, 1961, had nothing to do with Smith's death on December 2, 1961.

The statutes of Florida, where the claimant qualified as administratrix, and North Carolina, where the fire and explosions occurred, provide for a survival of all causes of action. Thus we are confronted with a determination of damages, either tort or contract, which Smith would have had he lived.

We do not agree that the minor barnacle scratches and exposure in the water were so *de minimis* as to be disregarded. We likewise feel that emotional distress is a proper item for consideration. For his minor scratches, exposure, exhaustion, and emotional distress, we award the sum of $2,200.

██ We agree with the United States that a claim for funeral expenses is not appropriate in this case where there is no causal connection between accident and death, even though Smith died ashore at a time when he was entitled to medical care and maintenance.[38]

The claim for funeral expenses might well present a different question if causal relationship existed.

██ Clearly the claim for maintenance and cure is valid even though the lung cancer may not have manifested itself while in the service of the ship. Obviously, Smith had the malignancy while aboard the POTOMAC. The claimant is entitled to hospital expenses incurred at Mease Hospital in the sum of $387.60, and maintenance at $8.00 per day for five days or $40.00.[39] Claimant is also entitled to recover the sum of $1,017.22 for moneys lost aboard the ship. Claims for pecuniary loss through Smith's anticipated retirement date in June 1962, and loss of earnings from September 28, 1961, to the date of his death on December 2, 1961, must be rejected for reasons heretofore stated, and for the further reason that the voyage was terminated by the fire and explosion and, thereafter, Smith received maintenance for his obvious disability.

A judgment may be entered in favor of Sarah Smith, Administratix of the Estate of John C. Smith, deceased, against the United States of America, in the sum of $3,644.82, with legal interest thereon from the date of judgment.

INJURY CLAIMS—WILLIAM H. MASSENGILL, WADE H. STANLEY, AND WILLIAM GERALD MASSENGILL

These three men were preparing to go fishing in the small boat near the railroad trestle when the fire originated at that point. Since they were not members of the POTOMAC's crew, they have no claim for unseaworthiness but must rest their case upon negligence. Damages are to be determined according to the usual principles of maritime law.

 The United States contends that, as to Stanley at least, any recovery should be diminished by the proportion

---

38. Cf. Trexler v. Tug Raven, 290 F.Supp. 429, 450, N. 36 (E.D.Va., 1968).

39. Smith was paid his maintenance from September 26, 1961, through November 9,

1961. Since he entered the Public Health Service Hospital at Savannah at 7:00 p. m., on November 14, 1961, we have computed his maintenance for five days.

of Stanley's contributory negligence on the theory that he had detected the fumes but permitted the open-flame lantern to remain in the bottom of the boat without extinguishing the flame. We do not agree that such failure to act constitutes contributory negligence. Nor are we of the opinion that the probable consequence of shipboard conduct was unforeseeable under the doctrine pronounced in Palsgraf v. Long Island R. R. Co., 248 N.Y. 339, 162 N.E. 99, 59 A.L.R. 1253 (1928). There was an unbroken connection between the wrongful act and the injury which constituted a continuous operation. Milwaukee & St. Paul Ry. Co. v. Kellogg, 94 U.S. 469, 24 L.Ed. 256 (1876).

### (a) William H. Massengill

William H. Massengill, the father of William Gerald Massengill, was 55 years of age at the time of the fire. He had been a tenant farmer his entire adult life and was, at the time in question, responsible for tending a 2½ acre plot of tobacco land. He received first and second degree burns of both hands and forearms to a point above the elbow, with some third degree burns on the arm, hands, and fingers being confined to small areas, such areas being so small that skin grafting was not required. The left hand was more severely burned and has resulted in arthritis, with a 20% permanent loss of function of the lower portion of this arm. The only permanent scarring was some depigmentation of the arms and hands. For several years following the injury his skin would be more sensitive to sunlight.

This claimant was brought to the Johnson Memorial Hospital, Smithfield, North Carolina, on the evening of September 27, 1961, having been transferred there from Cherry Point Hospital.[40] He remained in the hospital under the care of Drs. Alderman and Barnes until his discharge on October 23, 1961. He was thereafter followed until June 2, 1962. As to the arthritis in the hand, Dr. Alderman is positive that this condition is associated with the injury but, with respect to the arthritis in the shoulder and elbow, he cannot say that it is "totally" related to the fire.

The doctors, hospitals and drug bills aggregated $974.30. The property damage claim was $50.00. We turn, then, to the loss of earnings.

 The record is rather barren as to the elder Massengill's earnings. He testified that he was required to hire additional help at an expense of $300–$400 per annum because of his disability, but that otherwise he was performing his duties as a tenant farmer. Accepting the median figure of $350.00 for 7½ years, his maximum loss of earning capacity is $2,625 [41] for this period of time. An additional three-year life expectancy discounted at 4% amounts to $971.25 (rounded out to $975.00). No further award can be made for impairment of earning capacity due to the lack of evidence as to what the earnings have been in the past and what they were during the year of the fire.

Turning to consideration of an award for pain, suffering, mental anguish, and all of the physical injuries, there can be little doubt but that the elder Massengill was severely burned and underwent appreciable pain. We think that an award of $20,000 is fair and reasonable compensation.

A judgment may be entered in favor of William H. Massengill against the United States of America in the sum of $24,624.30, with legal interest thereon from the date of judgment.

### (b) Wade H. Stanley

Stanley was 51 years of age at the time of the fire. He supervises the opera-

---

40. The record is not clear as to whether this claimant was transferred from the hospital at Cherry Point or Camp Lejeune. The point is immaterial. The claimant testified that it was the Cherry Point Hospital.

41. Claimant testified that, prior to 1962, he handled the bulk of his farming work without much assistance.

tion of several farms and conducts a feed and fertilizer business. While the nature of his business activities requires that he remain outdoors a good portion of this time, he apparently does no personal active labor. Stanley received first and second degree burns on his face, neck, hands, arms, and forearms—more extensively on the left hand, arm, and left side of his face. He sustained no third degree burns. The only positive evidence of permanency was depigmentation centered over the left dorsal aspect of the left hand and around his ear and nose. Depigmentation produces photosensitivity. Like William H. Massengill, Stanley was initially taken to Cherry Point Hospital on the night of September 26, 1961, and was transferred to Johnson Memorial Hospital, Smithfield, North Carolina, on the following day. He was discharged from the latter hospital on October 10, 1961, and was last seen on November 11, 1961.

 Approximately six weeks prior to the trial in March 1963, Dr. Alderman examined Stanley for a lesion of the right lower eyelid. Stanley was referred to a specialist, Dr. Bizzell, in Goldsboro, for a possible malignancy. Dr. Alderman, a general practitioner, expressed the opinion that the condition was a "probable" malignancy, but he could not establish any causal relationship to the accident with any degree of medical certainty. Dr. Bizzell did not testify. As noted, Stanley had no third degree burns and this is the condition which generally gives rise to the development of cancer from a burn. Moreover, Stanley had a chronic condition of dermatitis and skin irritation for a period of approximately 15 years before the fire and, under all the circumstances heretofore mentioned, the evidence is insufficient to justify consideration of the eye lesion and possible or probable cancerous condition.

The medical, hospital, and drug expenses aggregated $567.30.[42] Property damage loss, consisting primarily of fishing gear and an outboard motor, was valued at $240. There is no provable loss of earnings and, in fact, no earnings shown by Stanley.[43]

We believe that a fair and reasonable award for the pain, suffering, mental anguish, and all of his physical injuries, is $12,000.

A judgment may be entered in favor of Wade H. Stanley against the United States of America in the sum of $12,807.30, with legal interest thereon from the date of judgment.

(c) *William Gerald Massengill*

 This young man, the son of William H. Massengill, was 19 years of age on the day following the disaster. At the time in question he was in the United States Air Force, having entered this branch of service approximately three months earlier. He was on authorized leave incident to a transfer to a new duty station.[44]

 First and second degree burns were sustained to the face, hands and forearms. Taken initially to the Cherry Point Marine Corps Air Station Hospital, he was transferred the next day to Seymour-Johnson Air Force Base, Goldsboro, North Carolina, where he remained

42. No evidence was introduced with respect to the expense of Dr. Bizzell's examination or treatment.

43. Answers to interrogatories propounded by the United States to Stanley do reveal his income according to his Federal Income Tax returns. The answers to the interrogatories were not admitted in evidence by stipulation, and Stanley was not questioned as to his earnings. The answers to interrogatories disclose that Stanley's income during the year of the disaster far exceeded his income for five years prior thereto. While we know of no rule of law which would permit consideration of such answers, we pause to say that there is no information as to whether the income, or part thereof, came from capital gains, etc.

44. Since he was on authorized leave and was not performing any duties connected with the United States, Massengill has a right to bring an action against the United States. Brooks v. United States, 337 U.S. 49, 69 S.Ct. 918, 93 L.Ed. 1200 (1949).

until October 13, 1961, when he was given a week-end pass to permit him to visit his home, following which he was formally released from the hospital on October 17, 1961. The notation on discharge is to the effect that his injuries were healing and that there would be little or no residuals.

Upon reporting to his new duty station at Bolling Air Force Base, he shortly thereafter commenced his duties as an air policeman, and continued in that capacity to the date of trial. He has no loss by reason of medical or hospital expenses, and no actual loss of earnings.[45]

According to medical testimony, the only apparent permanent injury is confined to whitish spots over small areas of the forearm resulting from depigmentation. The young man likewise complained that his left arm burned rather easily when exposed to sunlight, and that his face was sensitive to sun. He sustained a loss of property valued at $37.00.

The initial burns were, of course, more severe than that indicated by the final result. His hair and eyebrows were burned and, according to claimant, his hair is now considerably thinner, although he appears still to have a good head of hair. He complains of constant itching of the left arm which has a tendency to break out.

A fair and reasonable award for the pain, suffering, mental anguish, and all the physical injuries sustained by William Gerald Massengill is $7,000. There is no showing of any diminution

of earning capacity by reason of the accident.

A judgment may be entered in favor of William Gerald Massengill against the United States of America in the sum of $7,037.00, with legal interest thereon from the date of judgment. Since this plaintiff has now attained his majority, the judgment may be paid directly to him and his attorney.

### CLAIMS OF VARIOUS CREW MEMBERS

Many crew members filed claims herein. Some had proceeded by way of independent actions against the United States of America and Marine Transport Lines, which actions were filed in the United States District Court for the Eastern District of Virginia and were subsequently transferred to this court for trial.[46] Claims in the limitation proceeding (Admiralty No. 278) were thereafter filed alleging claims for personal injuries, loss of moneys (in some instances), medical expense, and loss of earnings by the following crew members: Lydon, Romero, Thomas, Burton, Alves, Berntsen, Bradfield, Brown, Fogg, Lee, Malone, Matamala, Minter, Nayer, Page, Pickens, Sang, Spates, Rice, Taber, Crawford, Holley, and Nelson—all represented by one firm of attorneys. Individual claims were likewise filed by seamen Sang, Fogg, and Taber, whose claims are included in the foregoing group. Crew members Craig and Cloud similarly filed claims represented by other attorneys.[47] None of the claims

45. The collateral source rule does not apply as the United States paid his salary and furnished all medical attention.

46. The independent action referred to herein is Admiralty No. 273, which was consolidated for trial with Admiralty No. 278 (the limitation proceeding) and Admiralty No. 272 (the Leonard death claim). The libel in No. 273 asserts claims for personal injuries, loss of moneys, medical expense, and loss of earnings, but makes no mention of any claims for maintenance. The crew members filing the independent action were Alves, Berntsen, Bradfield, Brown, Crawford, Fogg, Holley, Lee, Malone Matamala, Minter, Nayer, Nelson,

Page, Pickens, Sang, Spates, Smith, Rice and Taber. The claim of John C. Smith was later treated as a death claim, with other counsel appearing, and is the subject of separate discussion, *infra*.

47. Other claims were filed with respect to property damages and, as to these claims, the issue of damages has been reserved. They are: Aviation Fuel Terminals, Inc.; A. T. Leary, lessee of Beaufort & Morehead Railroad Co.; Home Insurance Co. as subrogee of A. T. Leary, etc.; and Coastal Realty Co. The United States of America has filed a cross-libel against Aviation Fuel Terminals, Inc., but this issue is terminated by the decision herein.

of the crew members assert in their pleadings any liability for maintenance. With respect to Crawford, any claim for damages by reason of the requirement of hiring an attorney is expressly disavowed.

■ At the outset we are confronted with the problem of handling the claims for maintenance which were supported by the evidence, at least in part, even though the pleadings failed to reveal any claim for same. To bar the claims on the technical ground of failure to allege same would invite a flood of requested amendments. Moreover, the seamen probably would not be barred by laches under the circumstances of this case and additional litigation would be forthcoming. It is also obvious that the Government, while not called upon to answer any claim for maintenance, did have some knowledge of maintenance as to several seamen as well as the amounts paid by way of maintenance. Questions involving maintenance have been fully briefed and argued. The Court concludes that it will consider the maintenance claims as shown by the evidence, reserving to the Government, following any appeal from the decision at this stage of the proceeding, the right to produce such further pertinent evidence as may be required touching upon the maintenance claims.

There are related matters touching the claims for maintenance. Ordinarily interest is allowable on such claims, but in this case interest is prohibited by virtue of the provisions of 46 U.S.C., sec. 782, as "[not] upon a contract expressly stipulating for the payment of interest." Thus, the United States of America is not liable for interest on maintenance claims.

■ In substantially all of the seamen's cases a claim for damages occasioned by the alleged failure to pay maintenance as and when due has been argued and briefed (although not alleged) by counsel. The right to collect such damages is predicated upon Vaughan v. Atkinson, 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962). As stated by this Court in Roberson v. S/S American Builder, 265 F.Supp. 794 (E.D.Va., 1967), the ultimate test is whether the shipowner was acting in good faith, or whether such actions were "callous," "recalcitrant," or clearly unjustified. As far as this record establishes, claims for maintenance when presented were processed and obviously paid in some instances. However, after the crew dispersed, it is impracticable to expect the United States of America or its operating agent to run down every crew member to determine whether they were outpatients or otherwise unfit for duty and, if so, on what dates the disability existed. For these reasons, claims of all seamen for damages under Vaughan v. Atkinson, supra, are denied. In one case (Henry R. Crawford), the claim for such damages was expressly waived during the course of trial.

We shall discuss the claims of these seamen in three categories, to-wit: (1) the claims of those who did not testify either at the trial or by deposition, (2) the crew members who were aboard the vessel and required to abandon ship, and (3) the crew members who were ashore at the time of the disaster, but who claim loss of moneys, personal property, and wages.

## CLAIMS OF SEAMEN WHO DID NOT TESTIFY AT TRIAL OR BY WAY OF DEPOSITION

■ Claims for loss of moneys and personal injuries were asserted by crewmen Theodore Brown, Edmundo Romero, Hom Yew Sang, Paul B. Spates, and Willie Thomas. Neither of these claimants testified in person or by deposition and their actions must be dismissed with prejudice. However, as to Hom Yew Sang, the United States points out that he filed an independent claim for loss of moneys in the sum of $680.10 "to which there is no objection." If this concession is tantamount to an admission that this sum is due and owing, a judgment may be entered in favor of Hom Yew Sang against the United States of America in

the sum of $680.10 plus interest from the date of judgment.

## THE CREW MEMBERS WHO WERE ABOARD THE VESSEL AND REQUIRED TO ABANDON SAME.

■ The threshold question is whether seamen who remained on board until the abandon ship order was given, and thereafter either slid down lines into the water or jumped off the stern and thereafter swam ashore or were retrieved by small boats, have actionable claims for exposure, an involuntary swim in water recording a temperature of 80 degrees and, in some instances, superficial rope burns or barnacle scratches. The United States relies upon Perez v. Suwanee S. S. Co., 239 F.2d 180 (2 Cir., 1956), relating to an inconsequential injury; Brown v. Potomac Electric Power Co., 236 F.Supp. 815, 819–820 (D.D.C., 1964), involving a sudden electrical explosion which caused a minor eye inflammation of brief duration; Healy v. United States, 192 F.Supp. 325 (S.D. N.Y., 1961), aff'd per curiam, 295 F.2d 958 (2 Cir., 1961); and Schmidt v. Merchants Despatch Transp. Co., 270 N.Y. 287, 200 N.E. 824, 104 A.L.R. 450 (1936), holding that no actionable wrong is committed if the danger is averted.

■ With the exception of Perez, supra, the authorities cited above do not discuss the de minimis rule. In the final analysis, it is probably a matter of degree. Under the facts and circumstances of this case, we do not believe that the doctrine of de minimis non curat lex should be invoked as to these seamen who were required to abandon ship. It is settled that a rule permitting recovery for fright does not require that the direct physical injuries be permanent or severe, and even though the sole physical injury may have resulted from an attempt to escape actual danger, damages are nevertheless recoverable for an impairment of health occasioned by the consequential fright. 25 C.J.S. Damages § 70a, p. 833. We conclude, therefore, that compensatory damages may be determined despite the minimal extent of any injury.

### Eugene Alves

■ This 27-year-old fireman water tender was on watch in the fire room when the fire broke out and the alarm shouted. As he had duties with respect to the attempt to get the ship underway, he remained in the fire room until the order to abandon ship was given. He then immediately went to the stern of the vessel, jumped into the water, and after swimming a short distance was picked up by a private yacht. He testified that he injured his low back on the right side while grabbing a mooring line or otherwise pulling himself along this line to reach a mooring dolphin. Taken to the Cherry Point Marine Corps Air Station Hospital, he was released after one hour with no significant complaints. He apparently returned to Portland, Maine, where there is a Public Health Service Clinic, and Alves reported there on October 3, 1961. The examination reflected "mild to moderate lumbar strain with no limitation of motion," and "anxiety reaction." He was refused a "not fit for duty" slip, but was instructed to return in two weeks and, in the interim, physical therapy three times per week and phenobarbital were prescribed. Alves registered for work through his union hiring hall approximately one week after the disaster, or about October 4, 1961, but this fact is not necessarily controlling as seamen are generally employed according to priority of registration. He returned to the Clinic on October 17, 1961, and the notation is "patient continues about the same." On October 31, 1961, Alves again went to the Clinic complaining of rectal pain and hemorrhoids which preexisted the disaster and are wholly unrelated.

On November 3, 1961, Alves elected to see a private physician in Portland. Dr. Crane took no x-rays but made certain statements relative to his findings, all being essentially subjective except where

negative.[48] Dr. Crane also advised counsel for claimant, by letter dated November 3, 1961, that it would not hurt Alves to return to work on board ship at that time.[49] Certainly as to any disability following a period of thirty (30) days from the disaster, such disability is not chargeable to what occurred on September 26, 1961.

The USNS POTOMAC was scheduled for overhaul about three (3) weeks following the disaster. The wages of all crewmen would have been terminated at that time. Of course, as to any crewman with a permanent disability, this could be of no consequence. Alves received a base pay of $373.84, plus overtime average approximating $263.10, per month. His daily earnings for the 12-day period prior to the disaster amounted to $24.33. We feel that his loss of earnings should be limited to approximately thirty (30) days and we fix his loss of earnings at $650. Maintenance, although never apparently claimed until trial time, is fixed at $8.00 per day for thirty (30) days, or $240, subject to the rights of the United States as heretofore stated.

Alves estimated that he lost $250 in cash as a result of the fire and explosion. We hold that he is entitled to this sum.

As to his claim for minimal injuries, fright, nervousness, etc., we find that a fair and reasonable award would be $1,000.

A judgment will be entered in favor of Eugene Alves against the United States of America in the sum of $1,900, plus interest from the date of entry of said judgment, and costs. A judgment may also be entered on the claim for maintenance in the sum of $240, plus interest from the date of judgment, subject to the right of the United States to insist upon a further hearing or to otherwise offer proof that same has been paid in whole or in part.

### Robert L. Bradfield

██ This 53-year-old A/B seaman was off duty and asleep in his bunk. He was aroused by the general alarm and went aft. Upon orders to abandon ship, he slid down a line and remained in the water until a small Coast Guard boat retrieved him.[50] He was in the water for approximately 30 minutes. He was taken to Morehead City and transferred to Cherry Point Marine Corps Air Station Hospital with no significant complaints other than rope burns and consumption of a quantity of sea water. He was released before midnight and spent the night in a Morehead City hotel. Upon his return to Houston, Texas, he checked into the Public Health Service Clinic on October 4, 1961, with complaints diagnosed as generalized myalgia or neuralgia. On October 10 he returned to the Clinic and was apparently feeling much better. He was instructed

---

48. Dr. Crane's testimony is as follows:
"I illicited no muscle spasm in evaluating his back and palpating it in the prone position. He did, however, have one spot that he said was tender on the right side of the low back in the vicinity of the fifth lumbar spinus process. Neurological examination, reflexes, sensation, motor power, and so forth, were all negative. I felt from this examination and from the history that he gave me, that he may well have strained his back during this or as a result of this explosion which took place on the tanker.
"I made an estimate of disability time at that time to be somewhere perhaps in the vicinity of eight to ten weeks" [from date of accident].

49. Dr. Crane's small bill for this examination cannot be considered. Roberson v. S/S American Builder, 265 F.Supp. 794 (E.D.Va., 1967), and authorities therein cited.

50. Bradfield testified that, as he was being hauled into the Coast Guard boat, an explosion from the POTOMAC knocked him into the cockpit, causing a cerebral concussion and rendering him momentarily unconscious. While we think it of no consequence to make a finding on this point, we doubt the testimony due to the estimated period of time that Bradfield was in the water. If required to make a finding, we would not conclude that he received such a blow on his head in the manner described by him.

to take the balance of his medicine. He was *not* declared fit for duty at that time, although there is no affirmative evidence that he was found to be unfit for duty. Bradfield again returned to the Clinic on November 24, 1961, at which time he was declared fit for duty, and he subsequently caught his next ship on December 16, 1961.

Bradfield, at the instance of his counsel,[51] was examined by Dr. Brown at Houston on October 31, 1961. Bradfield had suffered a stroke about 10 years prior thereto and the neurological abnormalities noted by Dr. Brown were related to his condition. There was some reddening of an eardrum which may have been a possible objective finding of a concussion. Other than the neurological test, which did not include any x-rays or audiogram, Dr. Brown's diagnosis was based upon Bradfield's complaints to him, including "unconsciousness" and "constant" headaches following the disaster.

Two days after the fire and explosion, Bradfield signed a statement saying:

"I suffered no injuries from fire but chafed my legs and testicles coming down line."

We find it difficult to believe that a man undergoing an experience of being blown into the cockpit of a boat following an explosion, and allegedly being rendered unconscious from a blow on the head, would fail to remember same two days later.

Dr. Brown's bill is not a proper item for consideration under Roberson v. S/S American Builder, supra. There is no suggestion that adequate medical facilities were not available at the Public Health Service Clinic.

Apparently maintenance to November 24, 1961, was paid to Bradfield. The record does not affirmatively disclose this fact, but the brief of the United States states this to be a fact and names the sum of $416. The reply brief does not take issue with the statement. Reserving to Bradfield the right to controvert the statement of payment of maintenance to November 24, 1961, the claim for maintenance is disallowed.

We think that, at best, a thirty (30) day period for loss of earnings would be adequate. While counsel for Bradfield compute his monthly earnings, including overtime, at $607, the Government appears willing to compute his earning capacity on the 12-day period prior to the disaster which amounts to $22.72 per day, or $681.60. Striking a fair average, we find that Bradfield sustained a loss of earnings in the sum of $650.

For his injuries, burns, accompanying fright, etc., we fix an award of $1,000. A judgment will be entered in favor of Robert L. Bradfield against the United States of America in the sum of $1,650, plus interest from the date of judgment, and costs.

*Therence G. Cloud*

This First Assistant Engineer was a member of the engine room group who attempted to get the POTOMAC underway as the fire approached the vessel. The only evidence as to his injuries appears from clinical records of Public Health Service clinics and hospitals located at Morehead City, Savannah and Jacksonville.[52]

On October 9, 1961, Cloud was found to be improved and marked not fit for duty for one week. He sailed from Houston, Texas, six days thereafter.

Clearly Cloud is entitled to 18 days loss of earnings. His *base* pay was

---

51. Bradfield at first denied that he visited Dr. Brown at the instance of counsel.

52. *Morehead City* notation on September 27, 1961: "Not fit for duty to return September 28, 1961 for further examination." *Savannah* notation on September 30, 1961: "Not fit for duty, to report to Jacksonville, Florida, outpatient clinic." *Jacksonville* notation on October 2, 1961: "acute upper respiratory infection, extreme nervousness probably due to accident, improved," but without evidence of pneumonia, pleurisy, any active pulmonary disease, and with a normal heart.

$856.47 per month. The record indicates his gross earnings for the 12-day period prior to the disaster to be $704.79, or an average of $58.73 per day. Computed on a per diem basis, including overtime, we arrive at the approximate sum of $1,050 for his loss of earnings.

While Cloud did not testify at the trial or by deposition, the medical record substantiates the fact that he sustained an illness as a result of the forced exposure. We find that an award of $900 for his illness, fright, nervousness, etc., to be fair and reasonable.

No claim has been made for maintenance and we assume that the same was paid. Reserving to Cloud the right to assert the same was not paid for the 18-day period, the maintenance is disallowed.

A judgment will be entered in favor of Therence G. Cloud against the United States of America in the sum of $1,950, plus interest from date of judgment, and costs.

*William F. Craig*

This Second Assistant Engineer was on the property of Aviation Fuel, going ashore with the Chief Engineer, when the fire started. He rushed back to the ship in an effort to get the vessel underway. He was in the engine room when the first explosion occurred on the forward end of the POTOMAC. He then went further down into the engine space to cut on another pump. Craig next went on deck where he learned that the master had ordered the crew to abandon ship. He jumped off the stern and swam about 20 yards to a mooring dolphin where other crew members were located. A fishing boat, the BUNNY TOO, threw the men a line and towed them into the harbor during which time the severe explosion took place in the vessel's after tanks.

Craig sustained cuts and abrasions on his arms and feet, presumably from barnacles on the dolphin. He was full of salt water, nauseous and thirsty. His com-

plaints at Cherry Point Marine Corps Air Station Hospital were confined to soreness and fatigue. He remained at Morehead City (not in the hospital) for several days and then returned to his home in Texas. About one week after the disaster, he had a cold and slight case of flu, lasting approximately one week. At no time after leaving Cherry Point station hospital on the night of the disaster did Craig ever consult a doctor, nor did he visit a Public Health Service facility. He was never declared unfit for duty.

 Craig, admitting that his physical condition was perfect a short time after the fire, states that he was unable to work—and did not work—for four months. He finally signed aboard a grain ship on February 6, 1962. Apparently his primary complaint is confined to his uneasiness about sailing on tankers. While we think that this latter item is not a legally compensable claim as such an uneasy feeling does not render a person unfit for other employment, including service aboard vessels other than tankers, we think that Craig's claim along these lines lacks merit under the burden of proof rule.

This claimant's loss of earnings should be limited to two weeks. His *base* pay was $726 per month. His gross earnings, including overtime, for the 12-day period prior to the disaster aggregated $591.91, or $49.33 per day. Computed on a per diem basis, we arrive at the approximate sum of $700 for loss of earnings.

No mention is made with respect to maintenance. It will not be awarded although, as in Cloud, the right is reserved to substantiate this claim if any exists.

For his slight injuries, illness, fright, etc., an award of $1,000 is made.

A judgment will be entered in favor of William F. Craig against the United States of America in the sum of $1,700, plus interest from the date of judgment, and costs.

*Henry R. Crawford*

This claim presents the most complex medical questions. Crawford was a pantry utilityman on the POTOMAC. He was born on June 3, 1908. At the time of the fire he was off duty and preparing to take a shower. When the general alarm sounded, he went to the stern of the vessel and later jumped into the water. He had signed aboard the POTOMAC on or about July 7, 1961, approximately two and one-half months prior to the disaster.

Crawford drifted out into the Morehead City harbor where the current carried him clear of the fire. He was apparently the first, or one of the first, members of the crew to be picked up. He was taken ashore, sent to the station hospital at Cherry Point, remained overnight, and was discharged the next morning. He returned to his home in Boston and claims to have checked into the Public Health Service Hospital, although these records are not in evidence. According to Crawford, he was told that he was in satisfactory condition and that nothing could be done for him.

 Crawford has been afflicted with a rare neurological disorder known as peroneal neuromuscular atrophy, also referred to as Charcot-Marie-Tooth disease (CMT), for approximately 30 years prior to the POTOMAC disaster.[53]

The real problem which arises in Crawford's matter is the fact that, without question, he would have reached his present condition within a relatively short period following the POTOMAC disaster. Thus it follows that his case does not fall within the familiar rule touching aggravation of a preexisting condition. Nevertheless, Crawford was capable of performing his usual duties aboard ship up to the moment of the fire and explosion. In short, it appears that the unfortunate incident of September 26, 1961, destroyed Crawford's desire and incentive to compensate for his physical disability.[54] This destruction of such motivating factors was not of Crawford's own making. We think that this claim should be treated as an acceleration of a preexisting condition and that it is compensable to the extent that it is believed Crawford would have been permitted to continue his services as a seaman, but not thereafter.

Crawford was 53 years of age at the time of the explosion. We cannot agree that he would have carried on his duties as a seaman until his retirement age of 65. We think that, as of September 26, 1961, Crawford's maximum working life expectancy was approximately five years with the ability to continue work being progressively lessened as the five-year period approached its end.

It is believed that the foregoing findings are substantially in accord with the majority view expressed in "Cause of Musculoskeletal Condition" set forth in 2 A.L.R.3d, pp. 294–353. True, the selection of a working life expectancy of five years involves a degree of speculation which is apparent in many cases, but we believe that such an approximation is fair and reasonable under all the circumstances relating to Crawford's claim.[55]

The claimant's earning capacity is also affected by his prior condition. During 1958 and 1959, he earned $7,700.80 and $9,173.27, respectively. His income for

---

53. The disease in question is a slowly developing degenerative condition, which affects the nerves and muscles below the knee, resulting finally in the disappearance of muscle tissue through atrophy thus leaving only skin and bones. By the time of the trial, approximately 90% of the muscles in both legs were absent in Crawford's case.

54. We do not agree that Crawford sustained any injury by reason of being struck by the ship's propeller. Objective evidence of any such event is absent. If the propeller had been moving, it assuredly would have caused some bodily injury.

55. There is minimal support for the five-year estimate in that the musculature was wasting away at the rate of 3% per annum.

1960 was only $2,541.78, due largely to the fact that he was involved in a serious automobile accident which hospitalized him for about four months. His 1958, 1959 and pre-accident 1960 earnings were those of a cook and steward. Following his apparent recovery from the injuries sustained in the automobile accident, he attempted to return to work as a cook-steward but only worked for a short period of time in that capacity. In 1961, his earnings in the lower paid job as a pantryman were only $1658.28 for the first nine months. At that rate he would have earned, if regularly employed for the entire year, only roughly $2,200.00. We do not, of course, know to what degree, if any, the automobile accident may have played a part in his ability to compensate for his preexisting physical condition brought about by the CMT disease. We can fairly assume that his earning capacity would have diminished as the disease became progressively intense. We feel that a total loss of earnings in the sum of $9,000 would be a reasonable forecast.

The only medical expense items in evidence are the bills of Dr. Hormell in the sum of $130 and Dr. Lewenstein for $365. The latter includes an item of $200 for litigation expense and, as to this amount, it is clearly not allowable. Aside from this factor, the primary reason for disallowance of all medical bills is that there is no showing that treatment could not be accorded at the Public Health Service Hospital in the area where Crawford lived and, until this is established, the law does not permit a recovery by a seaman for outside medical and hospital expenses.[56]

We approach Crawford's claim for maintenance and loss of moneys. As to the latter, a search of the record does not reveal that there is any evidence as to the loss of $250. With respect to maintenance, while there was no claim for same in the pleadings, we think that Crawford, who is now incurable and can never again work, should be treated as having reached a maximum possible cure stage in approximately 90 days at which time he was apparently seen by Dr. Horenstein and was diagnosed as having the CMT disease. We allow $720 by way of maintenance.[57]

For the minor injuries, fright, mental suffering during the accelerated period, and the actual acceleration of the preexisting condition for the same period, Crawford is allowed the sum of $15,000.

A judgment will be entered in favor of Henry R. Crawford against the United States of America in the sum of $24,720, plus interest from the date of judgment, and costs.

### Robert D. Fogg

This deck maintenance man was at a doctor's office in Morehead City when the fire broke out. He claims damages occasioned by a nervous condition. The claim is totally without merit and is not worthy of discussion.

His claim for moneys lost is equally suspect. While he testified that he had approximately $463 in his locker aboard the vessel, he had answered the issued monition by indicating this amount to be $25. We find that his loss of moneys amounted to $25.

While no claim for maintenance was alleged, it is immaterial as Fogg would not be entitled to same in any event. One is not entitled to maintenance merely because he becomes nervous thinking about an event which he did not even experience. Of course, it goes without saying that Fogg never saw a physician and was never declared unfit for duty. The entire claim, except for $25, is simply an effort on the part of a seaman to collect money to which he is not entitled. Even as to any claim for loss of earnings,

---

**56.** Roberson v. S/S American Builder, 265 F.Supp. 794 (E.D.Va., 1967). Other claims made in Crawford's belief as to certain medical and hospital expenses are not supported by the record.

**57.** Because the medical records are incomplete, it is impossible to ascertain exactly when Crawford reached maximum possible cure.

since Fogg was not aboard the vessel at the time of the disaster, he is barred from claiming the right to wages subsequent to the loss of the POTOMAC under 46 U.S.C., section 593.

A judgment will be entered in favor of Robert D. Fogg against the United States of America in the sum of $25, plus interest from the date of judgment, and costs.

### George Thomas Holley

Holley, a second cook and baker aboard the POTOMAC, was 42 years of age as of the date of the disaster. As with respect to many other seamen, he abandoned ship pursuant to order. He dropped 40 or 50 feet to the water. He was successful in swimming to the railroad trestle about one-fourth to three-eighths of a mile upstream, with the current running fairly strong in that direction. He climbed up on the trestle and thereafter managed to get to the highway bridge where he remained for an undetermined period of time [58] until a Coast Guard boat approached. He then dropped into the water and was pulled into the boat, following which he was taken to the Cherry Point Station Hospital where he remained for about two hours. He returned to Morehead City and remained there until September 30, 1961, when he went to Norfolk and checked in at the Public Health Service Hospital where, after examining him for a cough, he was told to report back on October 2, 1961, for chest x-rays.[59]

The x-rays revealed that Holley had active pulmonary tuberculosis on October 2, 1961—six days after the POTOMAC disaster. The sputum test was positive. He was admitted as a patient and remained until he was transferred to Piedmont Sanatorium where he was received on October 18, 1961. While in the Public Health Service Hospital, and prior thereto as far as this record reveals, there was no evidence of fever or coughing of blood.

On some date after June 17, 1962, the sputum test became negative. Holley was discharged from Piedmont Sanatorium on November 16, 1962, to report for outpatient care at the Public Health Service Hospital in Norfolk. He was finally declared fit for duty on July 1, 1963, and shipped out on a vessel on July 6, 1963.[60]

On August 12, 1943, Holley had been admitted to Grandy Sanatorium,[61] a tuberculosis hospital in Princess Anne County, for what appears to have been active pulmonary tuberculosis. He remained at this institution until May 11, 1944, when he left against the advice of attending physicians.

While at Piedmont Sanatorium he gave a history of smoking from one and one-half to two packs of cigarettes per day. While Holley admits smoking prior to the date of the disaster, he disclaims using the quantity of cigarettes referred to in the Piedmont history.

As previously noted, the air and water temperatures on the evening of September 26, 1961, were approximately 80 degrees Fahrenheit.

---

58. Holley testified that he was in the water for five hours. The fire and explosions took place about 6:45 p. m. Apparently Holley arrived at Cherry Point, distant appoximately 35 miles from the point of disaster, before midnight on September 26, 1961. The hospital record reflects that Holley referred to 45 minutes in the water. This is approximately correct, although it is possible that Holley remained in wet clothes for an hour or two while on the trestle and highway bridge.

59. Holley stated that he remained at Morehead City for seven or eight days. Later he indicated this period to be five to seven days. Since he obviously visited the Public Health Service Hospital on September 30, we must assume that his stay at Morehead City was limited to approximately three days.

60. Initially Holley stated that he waited two months for a ship—and this time is referred to in Holley's brief. On cross-examination Holley admitted that he caught a vessel on July 6, 1963.

61. Incorrectly referred to in the record as Granby Sanatorium.

The medical evidence is in conflict as to the extent of aggravation, if any, occasioned by the incident of September 26, 1961. There are suggestions that the events of that evening *might have* or *could have* contributed to reactivation of the tubercular condition. There is also evidence that it could not have aggravated the condition in any manner. Clearly, there is no credible testimony to support the claim that the incident *caused* the tuberculosis. Perhaps the most plausible explanation is submitted by Dr. Wray [62] when he said:

"I think if there was aggravation or exacerbation or progession, it was of a minimal nature and that his need for sanatorium care and the length of his sanatorium care that was required was related to his chronic active pulmonary tuberculosis and that what minor changes may have resulted from his experience would not have influenced either the need for sanatorium care or for the period that he required sanatorium care."

In sum, the events of September 26, 1961, may have triggered Holley's condition to the point that the necessity for his sanatorium care became more immediate, but clearly Holley did not have a truly arrested case of tuberculosis and we find that he had active pulmonary tuberculosis on September 26, 1961.

Holley's brief alleges the loss of moneys to the extent of $240. A review of the record does not disclose any testimony to support this claim.

 Holley had been aboard the POTOMAC for approximately 14 months prior to the disaster. Prior to his employment he executed a pre-sign-on medical form which, among others, contained a question relating to tuberculosis. The written answer, not in Holley's handwriting as to that particular question, was in the negative. Holley testified as to the questions asked of him at the time of the physical examination and denies that anything was said relating to tuberculosis, although he admits his signature to the form. While we believe that Holley's tubercular condition was active on September 26, 1961, we entertain no doubt that it became active during the period of his employment aboard the POTOMAC.

The United States argues that Holley has forfeited his right to maintenance by reason of a material misrepresentation as to his physical condition relying upon Milton v. Pure Oil Company, 165 F.Supp. 635 (E.D.Va., 1958), aff'd per curiam 264 F.2d 892 (4 Cir., 1959), and Tawada v. United States, 162 F.2d 615 (9 Cir., 1947). These authorities are inapposite. *Milton* was a case of willful concealment of *recent* medical history. *Tawada,* a tuberculosis case, demonstrated that the seaman knew that he was afflicted with a disabling disease, but nevertheless held himself out as fit. Holley, the present claimant, had no knowledge that his condition relating back 16 years had any adverse effect upon his health. We find that Holley is entitled to maintenance at the rate of $8.00 per day from September 26, 1961, to October 2, 1961, and from November 16, 1962, the date of his hospital discharge, until July 1, 1963, when he was declared fit for duty, or a total sum of $1,856. We reject any contention that Holley is entitled to damages by way of attorneys fees for the reasons previously stated with respect to all claimants, and, for the further reason, that the shipowner had a valid defense to the claim which could not readily have been resolved without litigation.

Holley has worked regularly as a member of the crew of various vessels since July 1, 1963. We reject Holley's contention that he strained his back in departing from the vessel and that he has recurrences of this condition. Nor can we justify any appreciable earning loss by reason of the events taking place on September 26, 1961. Such earning loss is fixed at four weeks (the probable date the POTOMAC's activity would have terminated) and we allow $650 for this item.

---

62. As stated in the record. The correct name of this witness appears to be Dr. Edward S. Ray.

For his physical and emotional stress, fright, minimal acceleration of his tubercular condition, etc., we award the sum of $3,000. It is assumed that Holley's cure at Piedmont Sanatorium was not at Holley's expense or was otherwise paid by the shipowner.

A judgment will be entered in favor of George Thomas Holley against the United States of America in the sum of $5,506.00, plus interest from the date of judgment, and costs.

### Thomas Lee

This ordinary seaman was on deck watch when the fire started. He gave the alarm into the after crew's quarters and pump room, following which he assisted the mate in shutting down the manifold valves and attempting to disconnect the cargo hose. As the fire progressed, he left the vessel by the gangway and went ashore without incident. He sustained minor injuries to his foot and back when someone ran into him in the gangway area, but concedes that, after being seen by a doctor in Morehead City, he received no further medical treatment but did apply liniment and took aspirin for several days.

The United States concedes that Lee has a valid claim for loss of moneys in the sum of $3,750, occasioned by his cashing a cashier's check for $2,750 just prior to leaving Houston, plus payoffs while aboard the POTOMAC.

For his minor injuries we allow $300. It is contended by Lee's counsel that Lee is entitled to his earning loss from the date of the disaster until the date of reshipment. We know of no such legal principle. As noted, the POTOMAC would have been overhauled approximately three weeks after September 26, 1961, and, allowing for some delay, the earning loss for crewmen not sustaining permanent or otherwise disabling injuries must be so limited. Since Lee's minor injuries cleared up in about one week, we find that he should be limited to $131.74 as he is otherwise barred by 46 U.S.C., section 593.

A judgment will be entered in favor of Thomas Lee against the United States of America in the sum of $4,181.74, plus interest from the date of the judgment, and costs.

### Abel Malone

This seaman was the chief cook aboard the POTOMAC. He was in his quarters, preparing to go ashore, when the fire broke out. He proceeded to the gangway and, as he was descending same, the fire reached the ship. Malone was ashore by the time of the first explosion.

It is admitted that Malone sustained no burns nor any immediate physical injury from either the fire or explosions. It is also obvious that he became extremely nervous for some period of time following the fire. The question arises as to whether this seaman, sustaining no immediate physical injury, can be compensated for fright and nervousness under federal law.

We have no hesitancy in finding that Malone would ordinarily be entitled to maintenance and cure under the circumstances. This is a matter of implied contract under admiralty law. His cure was rendered by the Public Health Service Hospital, outpatient clinic at Houston, and, while the record may be incomplete, it sufficiently supports a finding that Malone was still under treatment for nervousness as of November 13, 1961, and was not declared fit for duty until January 17, 1962. Since he was at all times an outpatient, we find that he is entitled to maintenance for 112 days at $8.00 per day, or $896.

The bill of Dr. Markewich in the sum of $20 is disallowed. There is no showing that Malone was not receiving adequate medical attention at the Public Health Service Hospital. It is solely an expense of litigation.

Malone's claim for compensatory damage, including any loss of earnings, presents a much disputed controversy among legal scholars. It is well settled that an action cannot be maintained for mental suffering alone. South-

ern Express Co. v. Byers, 240 U.S. 612, 36 S.Ct. 410, 60 L.Ed. 825 (1916); Western Union Telegraph Co. v. Speight, 254 U.S. 17, 41 S.Ct. 11, 65 L.Ed. 104 (1920). Furthermore, as to a claim such as was advanced by a fellow crew member, Robert D. Fogg, while it was disallowed on the basis of being completely unfounded, we think that the law requires some immediate physical connection with the incident giving rise to any emotional or nervous condition which may have allegedly contributed or caused the condition.

As indicated, we believe that Malone's nervous condition was proximately related to the fire in question. He had a narrow escape and, under the modern trend of authorities, is entitled to be compensated.

Judge Rives, speaking for the Fifth Circuit in Kaufman v. Western Union Telegraph Company, 224 F.2d 723 (5 Cir., 1955), attempts to distinguish the two Supreme Court cases cited above, and arrives at the conclusion that, where physical injuries result from emotional distress wrongfully or negligently caused, an action may be maintained. To the same effect are Belt v. St. Louis-San Francisco Ry. Co., 195 F.2d 241 (10 Cir., 1952), and Baltimore & Ohio R. Co. v. McBride, 36 F.2d 841 (6 Cir., 1930). The words "physical injury" do not require that there be a "visible" injury and, as stated in Crews v. Provident Finance Company, 271 N.C. 684, 157 S.E.2d 381 (1967), while damages for mere fright are not recoverable, if there is a contemporaneous physical injury resulting from the conduct of another, there may be a recovery. Stated otherwise, the mental anguish or disturbance must be a part of the physical suffering and inseparable therefrom before there can be a recovery. We believe that Malone's claim falls within the rule permitting a recovery for nervousness unaccompanied by any actual contact injury.

However monumental the legal issue may be, we cannot accept the assertion that Malone's nervous state brought about his marital separation and divorce. This allegation has a familiar ring. For the nervous condition occasioned as stated above, Malone will be awarded $2,000. He registered for work on or before October 5, 1961, and, while not specifically declared unfit for duty, was apparently treated as an outpatient at least until November 13, 1961, when he was then stated to be unfit for duty. Bearing in mind that his services aboard the POTOMAC would have been terminated approximately 30 days after the disaster, and mindful of the fact that reshipment is seldom immediate, his earning loss will be fixed at 60 days, or $1,422.

A judgment will be entered in favor of Abel Malone against the United States of America in the sum of $4,318, plus interest from the date of judgment, and costs.

*Avelino Matamala*

As heretofore stated, Matamala was the vessel's second pumpman but, when the fire broke out, was serving as pumpman on duty. He was 57 years old as of September 26, 1961. He abandoned ship by jumping off the stern. He held on to the ship's propeller until a Coast Guard boat picked him up. He was taken to the station hospital at Cherry Point where he remained overnight and was discharged the following morning. He returned to his home in Houston, Texas, where he went to the Public Health Service Clinic and was found to be fit for duty.[63] This was his only visit to this facility and was, according to counsel, on October 4, 1961. Matamala testified that he was told that there was nothing that could be done for him. Matamala registered for work the day following his return to Houston, but did not ship out until December.

---

63. The records of the Public Health Service Clinic were not introduced. Mata-
mala's counsel refers to a diagnosis of "post-explosive tinnitus."

On October 20, 1961, Matamala visited a private physician, Dr. Markewich,[64] and complained as to loss of hearing and ringing in his ears. This witness stated that Matamala's symptoms indicated "Cephalgia, which means pain in the head, buzzing about the left ear. I made the conclusion that it was secondary to the explosion and fire aboard the U. S. Navy Ship POTOMAC."

The medical evidence is far from satisfactory. Despite Matamala's assertion to the contrary, Dr. Markewich found no evidence of any ruptured ear drum, the drums and ossicles were normal, with no symptoms of trauma or concussion. There was, however, an infection in both ears which the doctor could not attribute to the explosion but which he suggested could have been caused by a sudden pulling of the drums.

According to Matamala's brief, he makes claim for bills to Dr. Donald M. Levy, known to be a prominent Norfolk neurologist, and Dr. George H. Williams, who apparently examined Matamala and ran an audiogram. The names of these two doctors do not appear in the record and their bills are not in evidence. Assuming that Matamala was examined by these doctors, it is a reasonable assumption that they would not have supported his claim with respect to the alleged condition of his ears (as related to the explosion) and that all neurological findings were negative. If Matamala never visited these doctors, the bills could not be considered. Moreover, once again we are met with the problem of not returning to the public facility available to all seamen wtihout cost. Without the record from the Public Health Service Clinic, it is impossible to determine the diagnosis, findings, etc. We agree that his claim is largely suspect.

For his trivial personal injuries he is allowed $1,500. Matamala will be awarded $250 for loss of earnings and maintenance for eight days, or $48.

A judgment will be entered in favor of Avelino Matamala against the United States of America in the sum of $1,798, plus interest from the date of judgment, and costs.

### James Henry Minter

Having finished taking a shower and while in the process of dressing, Minter, a galleyman, heard the general alarm and immediately went aft. Following the first explosion he jumped off the stern on the port side. Swimming with the current, he reached the causeway bridge where he held onto a piling until picked up by a Coast Guard boat.

Superficial cuts and scratches on his arms were treated by first aid. He was then taken to the station hospital at Cherry Point, remaining there overnight and being discharged the next morning. On September 30, 1961—four days after the disaster—Minter reported for outpatient treatment at the Public Health Service Hospital in Norfolk with symptoms being noted as a mild lumbosacral strain.

When he next returned on October 5, 1961, he was declared not fit for duty for two weeks and given an x-ray examination. The report on the latter reflected some slight postural change of the lumbar spine, then believed to be congenital. Later, on October 19, 1961, the diagnosis was changed to seminal vesiculitis. He was continued in a not-fit-for-duty status until November 21, 1961, when he was declared fit for duty.

At his counsel's request, Minter went to see Dr. W. Clarke Pole on October 27 and again on November 16. No x-rays were taken and all objective symptoms were negative. Dr. Pole expressed the view that Minter' complaints of pain on the extremes of motion in the lower back probably represented residual sprain symptoms in that portion of the back, and that Minter was improving nicely. Unfortunately Dr. Pole, an able orthopedic surgeon, did not have the records of the

---

64. The deposition taken of this doctor as to the *Malone* claim indicates that Dr. Markewich is a general practitioner.

Public Health Service Hospital and was not advised that Minter's condition had been diagnosed as seminal vesiculitis. He was merely asked, on cross-examination, whether seminal vesiculitis would produce pain in the area of the lower back and he replied in the affirmative.

Once again we have the problem of causation. There is no medical evidence indicating that seminal vesiculitis was in any way related to the POTOMAC disaster and, as Dr. Pole testified, the low back complaint could have been caused by seminal vesiculitis. On the other hand, the initial impression was a mild lumbosacral strain and the seminal vesiculitis may have existed or had its origin at the time of the accident and that this was the sole cause of Minter's complaints.

█ Admonished as we are in Vaughan v. Atkinson, 369 U.S. 527, 532, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962), to give the benefit of the doubt to a seaman in a claim for maintenance, we find that Minter is entitled to same until November 21, 1961, when he was released as fit for duty. This amounts to $448. Minter lost $83 in cash in the fire and is entitled to recover this amount. Dr. Pole's bill is not allowable as an item of cure as there is no suggestion that the Public Health Service Hospital could not adequately care for Minter. Since maintenance was never claimed, there is no basis for allowing damages by way of attorney's fees.

█ Irrespective of the allowance of maintenance for 56 days, we do not think it follows, as a matter of course, that loss of earnings should be governed by the same yardstick. We believe that the preponderance of credible evidence supports the view that, on and after October 19, Minter's disability was occasioned by seminal vesiculitis which, on this record, is not causally related to the incident of September 26, 1961. The allowance of maintenance subsequent to October 19 was due to the fact that the urinary infection may have had its onset while Minter was aboard the POTOMAC and, under applicable law, the doubt as to the right to maintenance must be resolved in Minter's favor. The loss of earnings for 23 days aggregates $447.81.

For Minter's minimal injury, his back strain, fright, etc., we award $1,600.

A judgment will be entered in favor of James Henry Minter against the United States of America in the sum of $2,578.-81, plus interest from the date of judgment, and costs.

### Clarence B. Nelson

As of the date of the disaster this ordinary seaman was 40 years of age, somewhat overweight, and with minor preexisting ailments. His principal and probably sole complaint worthy of discussion is a hearing loss. Nelson was in his room when the general alarm sounded. He proceeded to the stern and, together with other crew members, aided in casting off the after lines and breaking out fire hoses. The first explosion took place while he was still aboard the vessel, following which he left the ship by sliding down one of the stern lines. When about halfway down the rope, Nelson dropped the rest of the way into the water [65] and started to swim for shore. The second major explosion occurred while he was headed for shore and, upon arriving ashore, Nelson ran through the tank farm encountering some prickly pears or other sharp objects which caused burrs on his feet. A truck picked him up and took him to a local hospital in Morehead City, following which Nelson was transferred to the station hospital at Cherry Point the same evening. He was discharged two hours later following treatment for rope burns, burrs, and the removal of some material from his right ear.

Following Nelson's return to his home in Houston, he reported to the Public Health Service Clinic on September 29, 1961. The clinical record reveals rope burns on hand and feeling very nervous.

---

65. Nelson sustained minor rope burns which he assigns as the reason he decided to drop into the water.

That same day he made application for a duplicate set of seaman's papers and registered with the hiring hall. He subsequently visited the Clinic on October 2, 5 and 9, with an improved condition of the hand but still feeling nervous. However, on October 9, he was given a fit-for-duty slip. It was not until November 6 when Nelson again appeared at the Clinic and submitted a report from a private doctor indicating that he had retracted ear drums and a loss of hearing. Nelson was given another fit-for-duty slip on November 13, and caught a ship on November 20. He has been sailing regularly since that date.

On October 27, 1961, Nelson visited Dr. Brown, a neurosurgeon. Other than preexisting ailments, Dr. Brown diagnosed an anxiety state neurosis. Because of complaints as to hearing loss, Dr. Brown referred Nelson to Dr. Wolfe, an eye, ear nose and throat specialist, whom he saw on the following day, October 28, 1961.

Four months following the conclusion of the trial at New Bern, a further hearing was conducted at Norfolk. At the trial in New Bern permission had been granted to have Nelson examined by an ear specialist upon his return from sea. The principal reason for granting this request was because the depositions of Drs. Brown and Wolfe had been taken only a few days prior to the commencement of the trial. Prior to the hearing at Norfolk on July 29, 1963, Nelson had been examined by an ear specialist, Dr. J. Charles Dickson, at the request of the United States. Dr. Dickson's testimony was later taken and, while differing from Dr. Wolfe as to the likely cause of the hearing loss, does substantiate that Nelson definitely had such a loss.[66]

While Nelson has sustained a fairly substantial percentage of hearing loss, it is with respect to high tones. There is no apparent loss at lower tones. We find that Nelson sustained a concussion-type shock from the explosions which, in turn, contributed appreciably to a perceptive-type hearing loss. The claimant's specialist concedes that a portion of the hearing loss was probably due to advancing age and this tends to minimize the importance of the excluded evidence relating to the 1952 hospitalization.

Once again we have the problem with respect to medical bills rendered by private physicians. It must be remembered that, although apparently some substance was removed from Nelson's right ear at Cherry Point, he made no complaint to the Public Health Service Clinic at Houston as to any hearing loss until *after* he had seen Drs. Brown and Wolfe. Once having given the Clinic the report from Dr. Wolfe, the hospital was then on notice of the hearing loss but, as to this defect, Dr. Wolfe only saw Nelson on one subsequent occasion and, as to Dr. Brown, there is no showing that Nelson was refused or otherwise could not have been successfully treated for his anxiety state and minor preexisting ailments at the Public Health Service Clinic. Under the principles enunciated in Roberson v. S/S American Builder, 265 F.Supp. 794 (E.D.Va., 1967), and authorities therein cited, these bills cannot be allowed.

Nelson testified that he lost $75 in the fire, which item is allowed.

There is a dispute as to whether Nelson will be required to undergo the expense of a hearing aid and the maintenance of same. Dr. Wolfe indicated that a hearing aid would entirely correct the

---

66. Several years later, after the transcript had finally been completed, the Government requested leave to reopen the Nelson claim to introduce a 1952 hospital record bearing a notation with respect to scars on both drums with some minimal deafness, and a diagnosis of infectious hepatitis. Nelson had testified about this hospitalization long prior to his examination by Dr. Dickson. The short answer is that the Government, although having ready access to hospital records in a Government hospital, had never requested the production of the record. To permit the introduction of the 1952 hospital record would have required the retaking of depositions and possible additional testimony from the 1952 treating physicians. The evidence was rejected.

defect, but that it would take a period of months to handle the necessary adjustments and such would be impossible if Nelson remained at sea. Dr. Dickson expressed the view that a hearing aid would so magnify the nearly normal lower tones that they would be uncomfortably loud. In any event, Nelson has not incurred such an expenditure and apparently does not plan to do so. We are inclined to the opinion that a hearing aid would not prove to be a satisfactory solution of the overall hearing problem. The estimated possible future expense as testified to by Dr. Wolfe must be disregarded and the damages will be fixed under the assumption that the loss cannot be successfully adjusted by a hearing aid.

 Nelson makes no claim for maintenance and he apparently has been paid for this item. He is entitled to loss of earnings from September 27, 1961, to November 13, 1961, computed at $500 per month. He is allowed $750 for this item. While he has been regularly employed since November 20, 1961, and can establish no definite impairment of earning capacity as of the time of trial, we think it appropriate to give some consideration to the hearing loss as related to impairment of earning capacity in the overall allowance for his injuries.[67]

For the minor and permanent injuries sustained, including consideration of future impairment of earning capacity, an award in the sum of $10,000 is made.

A judgment will be entered in favor of Clarence B. Nelson against the United States of America in the sum of $10,825, plus interest from the date of judgment, and costs.

### Vadis Page

This 38-year-old able-bodied seaman was on watch near the No. 5 tanks on the catwalk when the fire broke out. At the direction of the Chief Mate, Page ran to the pump room to have the pumps cut off, and then began shutting down the deck manifolds and breaking out fire hoses while working his way aft. Together with the other members of the crew he was on the fantail when the first explosion occurred. On orders to abandon ship, Page slid down a line, dropped the last five or six feet to the water, and swam over to a mooring dolphin where other members of the crew were gathered. A fishing boat threw the men a line and Page, with others, was towed out into the harbor before being taken aboard. He was in the water about thirty minutes.

Page was taken to the local hospital where his right hand was treated and bandaged for a rope burn. He was transferred to the station hospital at Cherry Point and again the rope burn was treated and bandaged. He remained overnight and was discharged the next day.

On October 5, 1961, Page visited the Public Health Service Clinic at his home in Houston, with the records indicating nervousness and further treatment for the burn. He never returned thereafter and his fit-for-duty status is not indicated. In any event, he immediately registered for work and caught his next ship on October 20, 1961. He lost his wallet which contained $104.

 Subject to what has heretofore been said with respect to maintenance, he is allowed maintenance and loss of earnings for a period of fifteen days. Maintenance amounts of $120. Loss of earnings aggregate $300. For his minor injury, fright, etc., he is allowed the sum of $1,200.

A judgment will be entered in favor of Vadis Page against the United States of America in the sum of $1,724, plus interest from the date of judgment, and costs.

### Henry Pickens

This fireman water tender has died from natural causes unrelated to the disaster since the trial of this case. His

---

67. Nelson's counsel contends that the earning loss should be computed in accordance with the percentage of hearing loss. Such a misconception of damages is not worthy of discussion.

claim has been revived by Florence Pickens, the administratrix of his estate.

When the alarm was sounded, Pickens was in his quarters. He immediately went to the fire room and assisted the engineering personnel in operating the plant. Upon receiving orders to abandon ship, he went up on deck, slid down a line, and dropped the last few feet into the water. He swam out into the middle of the harbor and then, aided by the current, continued under the causeway and railroad trestle into the Newport River. He was found by a Coast Guard boat some distance upstream and is believed to be the last survivor rescued.

Taken initially to the Morehead City hospital, Pickens was transferred, to Cherry Point where he remained overnight and was discharged the next morning. He returned to his home in Alabama and then proceeded to New Orleans where he reported to the Public Health Service Hospital on October 2, 1961, and also registered for work with his union. The hospital record reflects small burns, apparently from the rope, on his left hand and forearm, myalgia of the neck and lower back muscles, hypertension, and lumbo-sacral sprain. He was declared not fit for duty and was subsequently given outpatient treatment at the Public Health Service Clinic in Mobile and by a doctor in his hometown. He was declared fit for duty on October 31, 1961, and caught his next ship on December 1, 1961. Pickens lost $33 in the fire.

Counsel for Pickens now claims maintenance, although it is not mentioned in the record. The petitioner's brief states that Pickens was paid $240 through October 31, 1961, the date that he was declared fit for duty. While the Court would allow maintenance for 34 days, or $272, it is apparent that maintenance was paid and, subject to the right of counsel for Pickens to be heard, the claim for maintenance is disallowed.

Allowing 30 days for loss of earnings, we award $530 for this item.

Pickens had a rather harrowing experience as he was in the water better than two hours. For his minor injuries, fright, etc., he is allowed the sum of $1,800.

A judgment will be entered in favor of Florence Pickens, Administratrix of the Estate of Henry Pickens, against the United States of America, in the sum of $2,363, plus interest from the date of judgment, and costs.

### Elmer E. Taber

Taber, the fourth mate on the POTOMAC, was not aboard the vessel when the fire broke out. He contends that he fell and injured his leg and back when he started to run back to the ship from a restaurant near the causeway. Originally, Taber filed a claim for personal injuries but his brief seeks loss of cash, maintenance and loss of earnings during disability. Indeed, Taber testified that he had no claim for personal injuries and we agree with his ultimate conclusion.

Any claim for loss of earnings is prohibited by the Wreck Statute, 46 U.S.C., section 593, since he sustained no personal injury and the vessel was a total loss.

Taber's claim for maintenance is *not* rejected because he was purportedly injured in an accident ashore. Taber apparently returned to his home and elected to rest until November 6, 1961, before registering for work. Conceding that he may have received treatment at a Public Health Service Hospital, there is no medical evidence reflecting that he was ever declared or otherwise not fit for duty.

Taber's claim for loss of money in the sum of $400 is allowed. Taber also claimed $1,180.75 for loss of personal effects, but he failed to testify anything with respect to same. Counsel assert that this was an oversight. While the latter statement may be correct, there is no law justifying an allowance of $1,180.-75, or any part thereof, where there is not a shred of evidence to support same.

A judgment will be entered in favor of Elmer E. Taber against the United States of America in the sum of $400, plus interest from the date of judgment, and costs.

## CLAIMS OF UNINJURED SEAMEN ASHORE FOR WAGES AND LOSS OF MONEY

Five seamen, Hans Berntsen, Willie Burton, Francis J. Lydon, Woodrow P. Nayer and Charles Rice, have filed claims for lost moneys and loss of wages from the date of the disaster until they were successful in catching their next ship. The last mentioned claim is precluded by the Wreck Statute, 46 U.S.C., section 593, and these seamen cannot recover for any loss of wages. They were apparently paid in full through the date of the disaster.

The claim of Willie Burton for loss of money is disallowed as he did not testify, either in person or by deposition. In fact, there is no evidence to support same.

While there is room for argument as to the Berntsen claim, we think that it should be allowed in the sum of $600. The claims of Lydon in the sum of $650, Nayer in the sum of $295, and Rice in the sum of $200, are not seriously controverted.

Judgments will be entered against the United States of America, plus interest from the date of judgment, and costs, in behalf of the following:

| | |
|---|---|
| Hans Berntsen— | $600 |
| Francis J. Lydon— | $650 |
| Woodrow P. Nayer— | $295 |
| Charles Rice— | $200 |

Appropriate judgment orders will be entered upon presentation.

## MEMORANDUM AND ORDER ON SUPPLEMENTAL FINDINGS

At the hearing on August 14, 1969, it was suggested that the First Assistant Engineer, Therence G. Cloud, had re-ceived no maintenance during his alleged disability, and had made no claim for same. Consistent with the memorandum opinion dated July 11, 1969, and counsel having waived their right to an evidentiary hearing, Therence G. Cloud is allowed maintenance at the rate of $8.00 per day for 18 days, or the sum of $144.-00, thereby increasing the total judgment in favor of Therence G. Cloud from $1950.00 to $2094.00. It is so ordered. The United States excepts to the allowance of any claim for maintenance on the ground that it was never requested nor asserted in any claim or pleading.

At the hearing on August 14, 1969, the attorney for the United States stated that the Second Assistant Engineer, William F. Craig, had received no maintenance and had made no claim for same. Counsel waived any right to a further evidentiary hearing. Craig did not testify. Whether he was ever declared unfit for duty is not known. While Craig was allowed loss of earnings for two weeks, it does not necessarily follow that he is entitled to maintenance for this or any other period. It is ordered that no allowance be made to William F. Craig by way of maintenance. The United States, while not objecting to the disallowance, reserves its exception to consideration of any award for maintenance on the ground that it was never requested nor asserted in any claim or pleading.

At the hearing on August 14, 1969, a release executed by Hom Yew Sang in the sum of $680.10 was exhibited. Counsel agreed that this claim had been previously satisfied and it is ordered that the findings be so amended.

The United States seeks a reduction in the award to Agnes Salopek, Administratrix of the Estate of Peter Salopek. The theory advanced by the Government is that the Court allowed the mother of the deceased seaman an award for her pecuniary loss without discount for 7½ years [1] but then picked up Mrs.

---

1. The lengthy memorandum refers to "eight years" without discount, but the computation of $1600.00 per annum for 7½ years results in $12,000.00 which was the pecuniary loss for this latter period.

Salopek's life expectancy at that particular date, to-wit, March 26, 1969, and the Court should have adhered to Mrs. Salopek's life expectancy at the time of her son's death. We disagree with the Government's contention on this point. Strictly speaking, a pecuniary loss payable to one who does not have as long an expectancy as the deceased, should be paid annually during the life of the dependent beneficiary. We see no harm in computing Mrs. Salopek's pecuniary loss based upon her expectancy at the end of the 7½ year period. It is reasonable to assume that the decedent, had he lived, would have continued his support until her death. The language in Gardner v. National Bulk Carriers, Inc., 221 F.Supp. 243, 247 (E.D.Va.1963), aff'd per curiam, 333 F.2d 676 (4 Cir. 1964), was stated in a situation where the decedent's wife was younger than the deceased. Moreover, the Court stated in *Gardner* that "the basis for the proper determination of damages is *essentially* fixed upon death." Nor do we believe that Van Beeck v. Sabine Towing Co., 300 U.S. 342, 347–349, 57 S.Ct. 452, 81 L.Ed. 685 (1937), is contrary to this ruling. The latter involved a widow who had remarried. We think that the policy of the law intends to award the beneficiary no more and no less than the best possible estimate of the Court as to what the dependent would have received but for the death of the seaman. The same question was before this Court in Whitaker v. Blidberg-Rothchild Company, 195 F.Supp. 420, 424 (E.D.Va.1961), aff'd. per curiam, 296 F.2d 554 (4 Cir. 1961), in which the mother's age was 50 at the time of her son's death and 52 at the time the decision was handed down. The Court computed the life expectancy of the mother as of the date of the decision. We adhere to this view in cases where the expectancy of the dependent is less than the expectancy of the decedent at the time of death. It is so ordered.

The United States has moved to reduce the award to Clarence B. Nelson. By order of Court entered on August 14, 1969, this award was increased from $10,075.00 to $10,825.00 due to the inadvertent failure to include an item of $750.00 for loss of earnings; a failure commendably called to the attention of the Court and opposing counsel by the Government attorney at the hearing on August 14, 1969. There is no merit to the motion to otherwise amend the findings as to Clarence B. Nelson, and it is so ordered.

■ This leaves for consideration the award to Mary Esther Ford Leonard, Administratrix of the Estate of Clyde V. Leonard, which is likewise subject to the motion to amend as filed by the United States. In part, at least, we think that there is merit to this motion. At the time of decedent's death, he was 57 years of age. As the dependent beneficiary, Mrs. Leonard testified that she was 58 at the time she testified on March 21, 1963 (Vol. X), it follows that she was slightly younger than her husband. The Court erred in making an allowance to Mrs. Leonard based upon the decedent's life expectancy had he reached the age of 65. The decedent's life expectancy at the time of death was 18.23 years.[2] By recomputing his life expectancy had he lived until the age of 65 (12.90 years life expectancy at age 65) the Court accorded the decedent's life expectancy a new status which, in the opinion of the Court, was erroneous. The Court allowed a full annual pecuniary loss of $2200.00 for 7½ years, or $16,500.00. The Court should have then allowed a pecuniary loss following the normal age of retirement (age 65) for 10.73 years, rather than 13 years as computed in the memorandum of July 11, 1969. The closest convenient factor for computing the discounted value is for 11 years, or 8.760. This would amount to $10,512.00, rather than the rounded out figure of $12,000.00 as specified in the memorandum opinion. Rounding out this figure we find that the original award of $34,500.00 should be reduced to $33,000.-00, the same representing the approximate difference of $1500.00.

2. Commissioners 1958 Standard Ordinary Table.

Other than the aforesaid error, we find that the basis for the award was well within the discretion of the Court in ascertaining proper damages. We do not believe that potential Social Security benefits should be considered in diminution of the pecuniary loss of the beneficiary. It is so ordered.